*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0278p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

            *Plaintiff-Appellee,*

    *v.*

STEPHAN FEKETE,

            *Defendant-Appellant.*

No. 07-5616

Appeal from the United States District Court
for the Eastern District of Tennessee of Chattanooga.
No. 06-00009—R. Allan Edgar, District Judge.

Submitted: June 6, 2008

Decided and Filed: August 5, 2008

Before: GILMAN and COOK, Circuit Judges; COHN, District Judge.[*]

---

## COUNSEL

**ON BRIEF:** D. Marty Lasley, NELSON, McMAHAN & NOBLETT, Chattanooga, Tennessee, for Appellant. Steven S. Neff, ASSISTANT UNITED STATES ATTORNEY, Chattanooga, Tennessee, for Appellee.

---

## OPINION

---

    RONALD LEE GILMAN, Circuit Judge. A jury found Stephan Fekete guilty on two counts of carjacking, on two counts of brandishing a firearm in relation to a carjacking, and on one count of conspiracy to commit multiple carjacking offenses. He is contesting on appeal (1) the sufficiency of the evidence as to the *mens rea* element of intent to cause death or serious bodily harm regarding one of the carjacking offenses, (2) the related offense of brandishing a firearm during that same carjacking, and (3) the district court's decision to count the two carjackings as separate convictions for sentencing purposes.

    Although there was no evidence of physical touching, no explicit threat of harm, and no direct evidence that Fekete's gun was loaded, we nonetheless conclude that a rational trier of fact could find beyond a reasonable doubt that Fekete had the conditional intent to cause death or serious

---

[*] The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

bodily harm during the disputed carjacking. We also conclude that the district court did not err in treating the two carjacking convictions as separate offenses for sentencing purposes. We therefore **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

On January 9, 2006, Gilbert Miller and his 14-year-old grandson, Colton Bartrum, were traveling together in Miller's pickup truck. Miller drove the truck to his daughter's residence in Chattanooga, Tennessee. He pulled into the driveway, left the truck idling, and told his grandson to remain in the vehicle while he went inside to briefly speak to his daughter. As Miller was exiting the truck, Fekete and coconspirator Patrick Pitts drove by. Fekete had picked up Pitts earlier that day and had proposed that the two of them steal cars and sell them to a "chop shop" for $5,000 per vehicle. When the two men saw Miller leave his truck idling in the driveway and enter the residence, they stopped. Pitts testified that he saw the back of a man going into a residence, leaving a truck that was idling and apparently unoccupied in the driveway. Fekete put on a hooded sweatshirt, concealed his face with a bandana, and approached the idling vehicle with a firearm in hand.

At trial, Bartrum testified that while he was waiting for his grandfather to return, he saw a shadow just before the driver's-side door opened. An individual wearing a hooded sweatshirt with a bandana over his face "pointed a gun" at his stomach and told him to "get out of the truck." Bartrum responded "okay," jumped out of the truck, quickly closed the door, and crouched to the ground. He explained that he squatted down on the ground so that the assailant could not see him "because, you know, I was scared he was going to shoot me in the back." Bartrum then ran and hid behind a metal garbage can before running inside the residence. Miller testified that Bartrum ran into the house crying, scared, and yelling "they took the truck, they took the truck." Bartrum also told Miller that the assailant had a gun. At trial, Bartrum testified that "on a scale of 1 to 10, 1 being, you know, not afraid and 10 being really afraid, I was probably 11."

After stealing the truck, Fekete and Pitts took it to the home of coconspirator Sarah Richie. Richie followed the two men to Knoxville, where she arranged for the group to meet with a chop shop owner named "Big Daddy," who purportedly purchased stolen vehicles. The group stayed in a hotel that night and arranged to meet with Big Daddy the next day. In the afternoon on January 10, 2006, two men arrived at the hotel to purchase the stolen truck. Fekete accepted $500 for the vehicle and, at the request of one of the men buying the truck, agreed to steal another truck and to deliver it the next day at a flea market in Sweetwater, Tennessee.

Unbeknownst to the defendants, the two men who arrived at the hotel to purchase the truck were detectives with the organized crime unit of the Knoxville Police Department. Ed Kingsbury, a 14-year veteran with the department, testified that he had received information that someone named Sarah was attempting to sell a stolen vehicle. It was Kingsbury and another detective who met with the defendants, bought Miller's stolen truck, and told Fekete that they would pay him more money for another truck. The entire transaction was videotaped. When Kingsbury encouraged Fekete to steal another truck, he did not know the circumstances under which the first truck had been stolen. Later that same day, Richie called Kingsbury and informed him that she and Fekete had another truck for him and arranged to meet him at the flea market.

The second truck was stolen from Adam Hughes, a 28-year-old delivery driver. Hughes had parked his truck at his apartment and was in the process of getting out of the vehicle when someone approached him from behind and yelled at him. Hughes turned around and faced Fekete, who was wearing a hooded sweatshirt with a bandana over his face and brandishing a firearm. Fekete cocked the gun, pointed it at Hughes's face, and told Hughes that if he did not hand over his keys Fekete would "blow his f- - -ing head off." Hughes gave his keys to Fekete, who immediately got in the

truck and drove off.  At trial, Hughes testified that he was "scared half to death" because he believed that Fekete was going to shoot him if he did not hand over his keys.

Hughes immediately reported the theft of his truck to 911.  Officer Audrey Jones, a property-crimes investigator with the Chattanooga Police Department, testified that she had been contacted by Kingsbury and warned that Fekete would be looking to steal another truck in the Chattanooga area.  After receiving Hughes's report, Officer Jones issued an alert for the truck and was soon notified that the police had spotted and pursued Fekete, and that the truck had been wrecked on a street in Cleveland, Tennessee.

Fekete was arrested shortly thereafter in a nearby area, and was later interviewed by Officer Jones and other police investigators.  Officer Jones testified at trial that Fekete had told her that he saw Bartrum sitting in Miller's vehicle before Fekete entered the truck.  She further related Fekete's statement that he had thrown the gun that he used during the two carjackings out the window when he was being pursued by the police.

FBI Agent James Melia also interviewed Fekete that same day.  Contrary to what he had said to Officer Jones, Fekete told Agent Melia that he had stashed the gun in Richie's car during a stop that they had made prior to his encounter with the police.  At Agent Melia's request, Fekete arranged for Richie to deliver the gun that was purportedly used in the carjackings to an undercover police officer.  Richie turned over to the undercover officer a .38 caliber semi-automatic pistol and a holster, which contained a magazine and three rounds of ammunition.  The holster, magazine, and the ammunition, however, fit a .40 caliber pistol rather than the .38 caliber pistol that was delivered to the undercover officer.  The government contends that Fekete used a .40 caliber pistol during the carjackings.  Agent Melia testified that he had learned by listening to Fekete's recorded telephone calls from the jail that Fekete had instructed Richie to deliver the wrong gun to investigators.  Specifically, during a jailhouse call to an unidentified person, Fekete had said that he had provided the police with "an unloaded gun, but used another gun."

Agent Melia also testified that the gun that the police assert was used in the carjackings—the .40 caliber pistol—was stolen from a police officer, that it was loaded at the time it was stolen, and that Fekete had purchased the gun in the presence of Pitts from Brian Rutherford, an acquaintance of Fekete.  Pitts testified that he had been with Fekete when the latter purchased a .40 caliber pistol from one of Fekete's acquaintances, that Fekete owned both a .40 caliber pistol and a .38 caliber pistol, and that Fekete used the .40 caliber pistol during the January 9, 2006 carjacking.

Testimony at trial, including the victims' descriptions of the gun used during both carjackings, indicated that the gun used was the .40 caliber pistol.  Although the government never recovered the gun, it presented testimony from Hughes that Fekete had cocked the gun during the second carjacking before pointing it at Hughes, suggesting that the gun was loaded.  The police officer who investigated the incident admitted, however, that an unloaded gun could be cocked just like a loaded one.  Agent Melia also conceded that he could not say for sure whether the gun was loaded during the crimes.

In April of 2006, Fekete's coconspirator Richie pled guilty to the conspiracy, both carjacking offenses, and the second firearms offense. Seven months later, coconspirator Pitts pled guilty to the conspiracy, the first carjacking, and the related firearms offense.  Fekete on the other hand, went to trial.  A jury found him guilty on all counts in February of 2007.  During Fekete's trial, both Pitts and Richie testified that harming vehicle owners was not part of the plan.  Pitts, however, acknowledged his understanding that Fekete was going to steal only unoccupied idling vehicles, and said that he was surprised and upset when Fekete used a firearm to steal Miller's truck.  When Richie was asked if it was part of the plan that Fekete was going to kill someone, however, she

answered "no, but the gun was used . . . [;]we never intended on hurting anyone, but when you pull a gun, if they say 'no' you're probably going to use it."

The district court sentenced Fekete to 60 months of imprisonment on the conspiracy charge; to 63 months for each of the carjackings, to be served concurrently with the conspiracy charge; to 84 months (7 years) for brandishing a firearm in connection with the first carjacking, to be served consecutively to the prior sentences; and to 300 months (25 years) for brandishing a firearm in connection with the second carjacking, to be served consecutively to all of the other counts. As explained by the court, 18 U.S.C. §§ 924(c)(1)(A), (C) & (D) mandate that the two carjacking convictions be counted as separate offenses, requiring consecutive sentences of 7 years and 25 years for brandishing a firearm during their occurrences. Fekete's total sentence was for a term of imprisonment of 447 months, which was at the bottom of the advisory Sentencing Guidelines range of 447 to 462 months.

This timely appeal followed. Fekete has limited the issues on appeal to the sufficiency of the evidence as to the first carjacking on January 9, 2006, to the related charge of brandishing a firearm during that crime, and to counting the two carjackings as separate convictions for sentencing purposes.

## II.  ANALYSIS

### A.      Standard of review

We review a claim of insufficient evidence in the light most favorable to the government. *United States v. White*, 932 F.2d 588, 589 (6th Cir. 1991). "[A] defendant claiming insufficiency of the evidence bears a very heavy burden." *United States v. Abboud*, 438 F.3d 554, 589 (6th Cir. 2006) (citation and internal quotation marks omitted). If we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, then the conviction must be upheld. *White*, 932 F.2d at 589.

Circumstantial evidence alone is sufficient to sustain a conviction under this deferential standard of review. *United States v. Clark*, 928 F.2d 733, 736 (6th Cir. 1991). The government is given "the benefit of all reasonable inferences" drawn from the evidence, and courts must "refrain from independently judging the weight of the evidence." *United States v. Suarez*, 263 F.3d 468, 476 (6th Cir. 2001). Moreover, all credibility issues are to be resolved in favor of the jury's verdict. *United States v. Paulette*, 457 F.3d 601, 606 (6th Cir. 2006) (citation omitted).

### B.      The elements of 18 U.S.C. § 2119 and conditional intent under *Holloway*

To obtain a conviction for carjacking, the government must prove that the defendant, (1) with intent to cause death or serious bodily harm, (2) took a motor vehicle, (3) that had been transported, shipped, or received in interstate or foreign commerce, (4) from the person or presence of another (5) by force and violence or intimidation. 18 U.S.C. § 2119. Although the statute punishes the act of a "taking or attempted taking of a motor vehicle from the person or presence of another by force and violence or by intimidation," the government "must show more than that the defendant committed the criminal acts; it must also show evidence of the specific mental culpability at issue" in order to satisfy § 2119's specific-intent requirement. *United States v. Adams*, 265 F.3d 420, 424 (6th Cir. 2001) (citing *United States v. Kimes*, 246 F.3d 800, 807 (6th Cir. 2001) ("[A] general intent crime requires the knowing commission of an act that the law makes a crime. A specific intent crime requires additional 'bad purpose.'") (alteration in original)). As a result, "regardless of whether the carjacker obtains the car through force or violence or through intimidation, . . . the defendant must possess the specific intent to cause 'death or serious bodily harm.'" *Adams*, 265 F.3d at 424 (citations omitted).

In *Holloway v. United States*, 526 U.S. 1, 11-12 (1999), the Supreme Court determined that the specific-intent element of § 2119 is satisfied by proof that the defendant possessed a "conditional intent" to cause death or serious bodily harm. The court reasoned as follows:

> In a carjacking case in which the driver surrendered or otherwise lost control over his car without the defendant attempting to inflict, or actually inflicting, serious bodily harm, Congress' inclusion of the intent element requires the Government to prove beyond a reasonable doubt that the defendant would have at least attempted to seriously harm or kill the driver if that action had been necessary to complete the taking of the car.

*Id.* A violation of the statute may therefore be established "if the United States can show beyond a reasonable doubt that a defendant had the intent to kill or seriously harm his carjacking victim if the victim resisted, even if the victim did not in fact resist and no attempts to inflict such harm were made." *Adams*, 265 F.3d at 424.

## C.        The parties' arguments

Fekete argues that there was insufficient evidence from which the jury could have found that he would have killed or seriously injured Bartrum if the teenager had not complied with Fekete's order to get out of the pickup truck. Specifically, he asserts that, because he did not verbally threaten to kill or harm Bartrum and did not touch him in any way, the government bore the burden of proving, at the very least, that the gun was loaded during the commission of the offense (i.e., that he had the ability to carry out the threat of death or serious bodily harm implied by the brandishing of a firearm). In other words, he argues that under the circumstances of the January 9, 2006 carjacking, the government was required to prove beyond a reasonable doubt that the firearm he used during the offense was loaded. He asserts that the government failed to meet that burden.

The government responds by arguing that the evidence presented at trial was adequate to support the jury's determination that Fekete was prepared to cause death or serious bodily injury to Bartrum if the latter had resisted Fekete's efforts to obtain the truck. It contends that Fekete's act of brandishing a firearm and pointing it at Bartrum's stomach alone provided sufficient evidence that Fekete had the specific intent to cause death or serious bodily injury had Bartrum resisted. Addressing the question of whether the firearm was loaded, the government argues that such proof is unnecessary because a gun can be used in other ways to cause death or serious bodily injury (e.g., by pistol-whipping the victim). Alternatively, the government argues that, even if such proof were required, there was sufficient circumstantial evidence to allow a reasonable jury to find that the .40 caliber pistol that Fekete used was actually loaded during the January 9, 2006 carjacking.

In summary, although the parties agree that the government was required to prove that Fekete possessed the intent to kill or seriously harm Bartrum if necessary to steal the truck, they dispute whether proof that Fekete brandished and pointed a weapon at Bartrum while ordering him to get out of the truck, without more (i.e., a physical touching or direct proof by the government that the firearm was loaded), is sufficient to satisfy § 2119's specific-intent element. We therefore must decide, in the absence of a physical touching, whether (1) the government is required to prove beyond a reasonable doubt that the firearm was loaded, and (2) there was sufficient evidence in the present case to allow a reasonable jury to find that Fekete had the conditional intent to cause death or serious bodily harm during the January 9, 2006 carjacking.

## D.        Caselaw on specific intent

Prior caselaw addressing the intent requirement of § 2119 provides limited guidance as to whether a defendant can be convicted under the statute absent proof beyond a reasonable doubt that the firearm was loaded. In *Holloway*, the primary case addressing intent under § 2119, the Supreme

Court held that an "empty threat" is insufficient to satisfy the statute's conditional intent requirement. 526 U.S. at 11. The Court stated that the statute's intent-to-harm element requires more than a showing that a car was taken "by force and violence or intimidation." *Id.* (citing 18 U.S.C. § 2119). Specifically, the Court determined that "[w]hile an empty threat, or intimidating bluff, would be sufficient to satisfy [the by-force-or-intimidation element of the statute], such conduct, standing on its own, is not enough to satisfy § 2119's specific intent element." *Id.* The same actions that satisfy the element of taking by force or intimidation are therefore not necessarily sufficient to establish proof of specific intent, but may nonetheless be considered as evidence of intent. *United States v. Malone*, 222 F.3d 1286, 1291-92 (10th Cir. 2000) (affirming a carjacking conviction and explaining that the same facts used to establish that a car was taken by force may be considered when determining if the defendant possessed the requisite specific intent to kill or harm).

Although *Holloway* made clear that "[a]n empty threat[] . . . or intimidating bluff[]" is insufficient to satisfy the statutory intent requirement, the Court unfortunately failed to address whether a carjacking committed by an assailant with an unloaded firearm qualifies as "an empty threat." *Holloway*, 526 U.S. at 11. Furthermore, a look at the facts behind one of the carjacking convictions affirmed in *Holloway* reveals that in two of the counts of carjacking affirmed by the Court there was no evidence of a physical touching—the threat to the victims was verbal only—and neither the Supreme Court nor the lower courts discussed whether the firearm was loaded. *Id.* at 4; *see also United States v. Holloway*, 921 F. Supp. 155, 156-57 (E.D.N.Y. 1996).

The Supreme Court did note, however, that "[i]n somewhat different contexts, courts have held that a threat to harm does not in itself constitute intent to harm or kill." *Holloway*, 526 U.S. at 12 n.13 (citing *Hairston v. State*, 54 Miss. 689, 694 (Miss. 1877) ("[W]e have found no case of a conviction of assault with intent to kill or murder, upon proof only of the leveling of a gun or pistol.")). Although *Holloway* could be read to suggest that verbal threats to kill or harm may rise to the level of more than an "empty threat" even in the absence of a physical touching or evidence that a firearm is loaded, the Court did not mention, let alone discuss, whether a firearm must be loaded in order to satisfy § 2119's specific intent requirement. *Id.* at 11. *Holloway* therefore provides little guidance on this issue.

A look at the caselaw from this and other circuits, however, reveals that the issue of whether a carjacker's firearm was loaded has generally not been treated by the courts as outcome-dispositive. Rather, the courts have looked at the totality of the relevant circumstances, including whether there was physical violence or touching and/or direct or implied verbal threats to kill or harm. In *Malone*, for example, the Tenth Circuit upheld a conviction for carjacking absent proof that the firearm used during the carjacking was loaded. 222 F.3d at 1291-92. It did so on the basis that physical force against the victim evidenced an intent to seriously harm her. The defendant in *Malone* pushed the victim to the ground and dragged her across a carport before tying up her family and forcing her to accompany him to her place of business in the vehicle. *Id.* at 1289.

Similarly, this court in *United States v. Adams*, 265 F.3d 420 (6th Cir. 2001), held that a physical touching with a weapon can satisfy § 2119's specific-intent requirement even in the absence of any direct evidence that the gun was loaded. *Id.* at 425; *see also United States v. Glover*, 265 F.3d 337, 339-42 (6th Cir. 2001) (affirming a conviction under § 2119 where the defendant threatened to kill the victim with a gun after putting the gun to the victim's head, without discussing whether the gun was loaded). In one of the carjacking convictions affirmed by the *Adams* court, however, there was no evidence of a physical touching. The *Adams* court nonetheless confirmed the conviction after finding that there was circumstantial evidence that the gun was loaded based on "the temporal proximity of Adams's firing shots at a police officer" later that day with the same gun. *Id.* at 425 n.2.

Another case on point is *United States v. Arnett*, 198 F.3d 247 (Table), 1999 WL 994000 (6th Cir. Oct. 22, 1999) (unpublished). *Arnett* concerned a carjacking where there was no evidence as to whether the firearm used in the offense was loaded, but involved extensive physical violence. *Id.* at \*1. There, the court affirmed Arnett's conviction on the basis that he threatened to kill the two victims, pistol-whipped one into unconsciousness, forced both to stay in the car, and eventually raped the other victim. *Id.* In dicta, however, the court opined that pointing a gun at carjacking victims while ordering the victims to do some specific act carries the "clear implication . . . that if [the victims] did not comply, they would be shot or otherwise injured." *Id.* at \*5. There is no necessity, according to *Arnett*, for a defendant to "have issued a verbal threat expressly saying something along the lines of 'your car or your life'" because the only "reasonable interpretation" of pointing a gun at a carjacking victim's head is "either relinquish control or the car or you will be shot." *Id.*

Numerous courts, however, have acknowledged the difficulty posed by the question of whether a factfinder may find specific intent under § 2119 absent either a physical touching or evidence that the firearm was loaded. *See, e.g.*, *Adams*, 265 F.3d at 425 n.2. In *Adams*, this court acknowledged that in order to find that the defendant had the specific intent to kill or seriously harm that victim, it was required to determine, "at the least," that "Adams could have carried out his threats to harm his victims." *Id.* at 424-25 (citing *Holloway*, 526 U.S. at 11-12). It then called into question the validity of finding specific intent to kill or harm absent some evidence that the firearm used during the offense was loaded and acknowledged that it was "aware of several [state and military] cases overturning convictions for both specific-intent crimes and crimes committed with a 'dangerous weapon' absent proof of a loaded gun. *Id.* (citing cases).

Other circuits that have directly addressed the difficulties posed by a lack of evidence as to whether a firearm used in a carjacking was loaded have likewise expressed doubt as to whether verbal threats made with an unloaded weapon would alone be sufficient to prove specific intent to kill or cause serious bodily harm. *See Malone*, 222 F.3d at 1291-92 (recognizing the proposition that, during a carjacking, a direct order made with an unloaded weapon might be insufficient to satisfy the intent requirement of § 2119, but finding no need to address whether the firearm was loaded because acts of physical violence against the victim demonstrated a real and present intent to seriously harm her); *United States v. Jones*, 188 F.3d 773, 777 n.2 (7th Cir. 1999) (upholding the defendant's conviction where he pointed a gun at a driver and told the driver to do as ordered "or 'I'll shoot you[,]' coupled with telling the driver to 'get down or else,'" but noting that "if a defendant made the same threats, but carried an *unloaded* gun, the intimidation element would be satisfied but the intent element might not" (emphasis added)).

## E.    Totality-of-the-circumstances test

Given the conflicting caselaw on point, Fekete would have us clarify the law in this area with a holding that, absent evidence of a physical touching, the courts should require the government to prove beyond a reasonable doubt that the firearm used in a carjacking was loaded. We respectfully decline to do so. The sheer number of cases discussed above from this and other circuits that have upheld carjacking convictions under § 2119 without any substantive discussion as to whether the firearm used during the carjacking was loaded counsel against any holding that makes the government's inability to prove that the firearm was loaded dispositive of intent.

Although there is no question that the government carries the burden of proving beyond a reasonable doubt that a carjacking defendant had the requisite conditional intent to kill or cause serious bodily harm, the use of a loaded gun (or even an unloaded one) is not a required element of the carjacking statute. The requisite *mens rea* can be shown by evidence of an intent to use a knife, a baseball bat, brute force, or any other means that indicates an ability and willingness to cause serious bodily harm or death if not obeyed. A lack of proof beyond a reasonable doubt that a gun

was loaded, therefore, does not foreclose the possibility that (1) the defendant nonetheless had the requisite conditional intent to cause death or serious bodily harm by other means (e.g., pistol-whipping or brute force), or (2) the weapon was in fact actually loaded. *See, e.g.*, *Arnett*, 1999 WL 994000, at *3-4 (finding that although there was no evidence as to whether the firearm was loaded, the evidence was sufficient for the jury to find that the carjacking defendant had the requisite intent to kill or seriously harm the victims given that he threatened to kill them, pistol-whipped one victim into unconsciousness, forced the victims to stay in the car, and raped the other victim); *Adams*, 265 F.3d at 425 (concluding that the evidence was sufficient to find that the carjacker's gun was loaded based on the circumstantial evidence that he had fired shots at a police officer later that day with the same gun).

Absent some additional evidence of bad intent, however, evidence that a defendant brandished a firearm during a carjacking is insufficient on its own to establish a specific intent to kill or cause serious bodily harm. *Holloway*, 526 U.S. at 11 (concluding that "[a]n empty threat, or intimidating bluff, . . . standing on its own[] is not enough to satisfy § 2119's specific intent element"); *Adams*, 265 F.3d at 424 (requiring the government to "show more than that the defendant committed the criminal acts; it must also show evidence of the specific mental culpability at issue" (citation omitted)).

The government must therefore present additional direct or circumstantial evidence that supports a finding that the defendant would have killed or seriously harmed the victim if the victim had resisted where the *only* other evidence of intent is that the defendant brandished a firearm. In other words, in the absence of a physical touching or direct proof that the firearm was loaded, the government must establish "brandishing-plus" in order to satisfy § 2119's specific intent element. Additional evidence of intent may come in the form of circumstantial evidence that the firearm was loaded or other evidence related to the defendant's acts or statements (e.g., a threat to kill or harm) that suggests that he or she had the requisite specific intent.

Once the government produces evidence of intent beyond the simple fact that the defendant brandished a firearm, the factfinder is to look at the totality of the circumstances to evaluate whether the defendant's words and actions sufficiently demonstrated a conditional intent to cause death or serious bodily harm. *See Malone*, 222 F.3d at 1291 (holding that courts should look to "the totality of the circumstances" to determine if conditional intent to kill or cause serious bodily harm exists). Evidence as to whether a firearm was loaded remains highly relevant at this point because such evidence goes directly to the defendant's ability to carry out his threats—an essential factor to be considered in the overall calculus of whether the defendant possessed sufficient intent to kill or cause serious bodily harm. *See Adams*, 265 F.3d at 424 (explaining that conditional intent requires "a showing that [a defendant] could have carried out his threats to harm his victims" (citing *Holloway*, 526 U.S. at 11-12)).

If the government's evidence that the gun was loaded is weak, its argument that the carjacking defendant had the ability to carry out his threats is diminished, which in turn weakens its argument that the defendant possessed the conditional intent to cause death or seriously bodily harm. The defendant, on the other hand, can significantly bolster his or her defense by affirmatively demonstrating that the weapon was unloaded. Assuming that a defendant is able to present evidence that he or she knowingly chose to carry an inoperable firearm or purposely unloaded the firearm before committing a carjacking offense, such evidence would strongly suggest that the presence of the gun was an "empty threat" or an "intimidating bluff," thus undermining the government's assertion that the defendant intended to kill or seriously harm the carjacking victim. *See Holloway*, 526 U.S. at 11.

**F.      Fekete's specific intent**

We will now evaluate whether, under the totality of the circumstances in this case, a reasonable jury could have found that Fekete had the specific intent to kill or cause serious bodily harm to Bartrum during the January 9, 2006 carjacking had Bartrum resisted. Although the evidence here presents a very close case, we believe that the government produced sufficient evidence at trial that Fekete possessed the requisite specific intent.

To start with, the government introduced circumstantial evidence that Fekete used a loaded .40 caliber pistol during the offense. It produced evidence that Fekete had purchased a loaded .40 caliber pistol prior to the carjackings, for which he acquired additional ammunition, and which was fully loaded at the time it was stolen from its original owner. And although the .40 caliber firearm allegedly used in the carjackings was never recovered, coconspirator Richie turned over to the police a holster, magazine, and additional ammunition for a .40 caliber pistol after the carjackings. Fekete was also recorded during a jail-house call as saying that he had deliberately tried to mislead authorities by instructing Richie to turn over a different unloaded firearm—i.e., the .38 caliber pistol—to the police. His coconspirator Pitts further confirmed that Fekete owned a .40 caliber pistol and that Fekete had used it during the carjackings. In addition, Richie testified that, although she and Fekete never intended to hurt anyone, "when you pull a gun, if they say no you're probably going to use it." The government also argues that the jury could have concluded that the firearm was loaded because, in the second carjacking, which occurred within 24 hours after the January 9, 2006 incident, Fekete made an explicit threat to shoot the victim and had cocked the pistol. Finally, the government notes that Fekete introduced no proof at trial that the firearm he used during the carjacking was unloaded.

Fekete, in response, argues that he did not have the intent to kill or harm Bartrum because he thought he was selecting a vehicle that was empty. The government counters by pointing out that the jury had reason to disbelieve Fekete's assertion that he thought the pickup truck was unoccupied. Specifically, the government notes Officer Jones's testimony that, in her interview with Fekete, he told her that he saw the boy in the truck before he opened the driver's-side door. The government also argues that the jury was free to conclude that Fekete knew that someone was in the vehicle based on the fact that he chose to carry a gun and conceal his face with a hooded sweatshirt and bandana, noting that "if [Fekete] did not expect to encounter anyone inside of a running vehicle he would have had no need to carry a firearm or disguise his appearance."

The government further notes that Fekete pointed the gun at Bartrum's stomach while directing him to exit the pickup truck. It argues that this action is the equivalent of issuing a direct verbal threat to kill or harm and that this threat supports the jury's finding of specific intent. *See United States v. Arnett*, 198 F.3d 247 (Table), 1999 WL 994000 at *5 (6th Cir. Oct. 22, 1999) (unpublished) (noting in dicta that pointing a gun at two carjacking victims while ordering them to do some specific act carries the "clear implication . . . that if [the victims] did not comply, they would be shot or otherwise injured," and that it is not necessary for a defendant to say something along the lines of "your car or your life" because a threat to harm may be implied by a defendant's actions). We agree with *Arnett's* analysis.

In light of the totality of the circumstances discussed above, we conclude that there was sufficient evidence to allow a rational trier of fact to find beyond a reasonable doubt that Fekete had the conditional intent to kill or seriously harm Bartrum if he had resisted. We therefore affirm Fekete's § 2119 conviction for the January 9, 2006 carjacking. Because Fekete's challenge to his first firearm conviction under 18 U.S.C. § 924(c) is derivative of his conviction for the January 9 carjacking (i.e., he contends that he cannot be convicted of using a firearm during the crime of carjacking because he was not properly convicted of the underlying offense), we also affirm his conviction on the related § 924(c) count.

**G.     Sentencing challenge**

Fekete's final argument is that the district court erred in counting the two carjacking convictions as separate offenses for purposes of 18 U.S.C. § 924(c) because he was also convicted of conspiracy to commit multiple carjackings under 18 U.S.C. § 371.  Section 924(c) mandates consecutive sentences of 7 years for brandishing a firearm during a first felony offense and 25 years for brandishing a firearm during a second felony offense.  18 U.S.C. §§ 924(c)(1)(A), (C) & (D). The argument that Fekete's conspiracy conviction somehow negates his two separate convictions for carjacking is woefully undeveloped by Fekete's counsel, appearing in a single paragraph and citing no authority.  We therefore conclude that this argument has been waived. *See United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006) (holding that arguments referred to in a perfunctory manner and unaccompanied by some effort to develop argumentation are deemed waived).

Moreover, even if we were to reach this argument, it has no merit.  Sections 924(c)(1)(A), (C) & (D) clearly provide that two firearm convictions in connection with separate underlying felony offenses must be counted as independent convictions, carrying consecutive sentences of 7 and 25 years.  And in *Deal v. United States*, 508 U.S. 129 (1993), the Supreme Court held that where a defendant is charged and convicted of multiple § 924(c) offenses in the same case, each additional conviction is "a second or subsequent conviction" within the plain meaning of the statute.  *Id.* at 136-37.  We thus see no reason why the fact that Fekete was also convicted of conspiracy to commit multiple carjackings would alter the propriety of sequentially counting the two separate carjacking convictions here.  The district court's sentencing determination was therefore appropriate.

## III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.