NOT RECOMMENDED FOR PUBLICATION
File Name: 12a0687n.06

No. 11-5491

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

**Jun 28, 2012**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE WESTERN DISTRICT OF |
| | ) | TENNESSEE |
| ARTHUR CHANDLER, | ) | |
| | ) | OPINION |
| Defendant-Appellant. | ) | |
| | ) | |

**Before: MARTIN, GILMAN, and WHITE, Circuit Judges.**

**RONALD LEE GILMAN, Circuit Judge.** Arthur Chandler was convicted of carjacking, robbery affecting interstate commerce, and using a firearm in relation to both the carjacking and robbery offenses. He was sentenced to 552 months of imprisonment.

Chandler argues on appeal that his convictions should be overturned because the evidence was insufficient to support the carjacking and robbery charges. If these underlying offenses are invalidated, he contends that his firearms convictions must be reversed as well. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

**I. BACKGROUND**

**A. Factual background**

**1. The carjacking**

Faith Jeffries pulled up to her Memphis apartment complex in her car around 9:00 p.m. on November 15, 2009. As she began to step out of the vehicle, two men dressed in black and wearing face masks—later identified as Rodney Benton, Jr. and Arthur Chandler—approached with guns drawn and ordered her to "get out, get out [of] the car." Jeffries testified at trial that she initially believed that the men were joking, but quickly realized that they were serious. As she followed their instructions, "one of the guys had a gun to my head, the second guy had the gun to my side." Jeffries later confirmed that the guns were "press[ed] up against [her]," but she subsequently stated that one of the guns was only "pointing . . . towards my, you know, face. And the other one, . . . he had the gun to my side . . . ." The record contains no information about whether these guns were loaded or operable.

After gaining control over Jeffries's vehicle, the two men discussed whether to put Jeffries in the trunk or in the back seat, ultimately deciding on the back seat because the trunk was tied shut due to a malfunctioning latch. Benton got into the driver's seat and Chandler joined Jeffries in the back seat, keeping his gun pointed at her. Both men then removed their face masks.

The trio pulled out of Jeffries's apartment complex and drove around for about 15 to 20 minutes. During this time, Jeffries saw a couple of police vehicles patrolling and thought about jumping out of the car. But she decided not to do so in each instance because of Chandler's gun and because "they kept telling me everything was going to be all right, we're not here to hurt you or nothing like that, we just need the car." They also offered to leave some money under the driver's seat and to return the car to Jeffries's apartment complex after they finished using it. Shortly

thereafter, they let her out of the car, allowing her to retrieve her house key as she exited. Jeffries

confirmed that neither man ever laid a hand on her or threatened to cause her physical harm at any

point during her abduction. When Jeffries later spoke to police officers, she identified both Benton

and Chandler from photographic lineups.

### 2. *The McDonald's robbery*

Benton and Chandler then drove to a McDonald's fast-food restaurant in nearby

Germantown, Tennessee. They entered the store around 10:00 p.m. No customers were in the

restaurant at the time, nor were any using the "drive-thru" window. Both Benton and Chandler had

donned their facemasks again. One of the men pulled out his gun, and both men forced several store

employees into the walk-in refrigerator, held manager Linda Goodwin at gunpoint, and told her to

open the restaurant's safe. Goodwin explained that she did not have the keys to the safe because she

was only a manager-in-training. One of the men (the record does not identify which one) held

Goodwin with her face pressed against the refrigerator. This individual did not have a gun. The

other man retrieved the manager from elsewhere in the restaurant and forced him to open the safe

at gunpoint. Benton and Chandler then took approximately $450 from the safe.

Goodwin was able to secretly press a silent security alarm attached to her person, thus

alerting the local police to the robbery while she was being restrained by one of the robbers. Officers

from the Germantown Police Department, who were in the process of a shift change, arrived within

minutes from their headquarters, which was only a couple of blocks away from the McDonald's

restaurant.

Officer Michael Rogers arrived on the scene first and saw what was later identified as Jeffries's car idling in the parking lot. Benton and Chandler were still inside the restaurant. Officer Rogers arrested Chandler as he attempted to flee out a side door. Chandler did not have a weapon on his person. Benton initially hid in the restroom, but was apprehended when he came out a few minutes later.

Detective Darrell LaRiviere arrived to process the scene about a half an hour later, after Benton and Chandler had been arrested and removed from the premises. He saw that the arresting officers had placed on the floor of the restaurant approximately $450 in cash from the safe and an unloaded gun "that was broke into two pieces." None of the officers found any ammunition at the scene.

The McDonald's restaurant in question receives its food products from a distribution center within Tennessee. Several of these products originate in other states, such as beef from Illinois and chicken nuggets from Georgia, but all of the out-of-state products are routed through the Tennessee distribution center.

## B. Procedural background

In December 2009, Benton and Chandler were indicted on four counts: carjacking, in violation of 18 U.S.C. § 2119 (Count One); using and carrying a firearm during and in relation to the carjacking, in violation of 18 U.S.C. § 924(c) (Count Two); robbery affecting interstate commerce, in violation of 18 U.S.C. § 1951 (Count Three); and using and carrying a firearm during and in relation to the robbery, in violation of 18 U.S.C. § 924(c) (Count Four).

The case was set for trial in January 2011. Benton pleaded guilty on the morning of trial and was eventually sentenced to 300 months of imprisonment. Chandler waived his right to be tried by a jury, instead proceeding with a bench trial that lasted a single day. At the close of the government's case-in-chief, Chandler filed a motion for acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. The court denied the motion and delivered its verdict the following day, finding Chandler guilty on all four counts. Chandler was sentenced in April 2011 to a total of 552 months in prison. This timely appeal followed.

## II. ANALYSIS

### A.  Standard of review

Claims of insufficient evidence are reviewed in the light most favorable to the government, *United States v. Fekete*, 535 F.3d 471, 476 (6th Cir. 2008), and a defendant asserting that the evidence was insufficient to sustain his conviction "bears a very heavy burden." *Id.* (internal quotation marks omitted). Credibility determinations must be resolved in favor of the verdict, and circumstantial evidence alone may be sufficient to convict. *Id.* We must uphold a conviction where we determine that "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

### B.  The carjacking

A carjacking conviction requires the government to prove that the defendant (1) "with the intent to cause death or serious bodily harm," (2) "[took] a motor vehicle," (3) "that ha[d] been transported, shipped, or received in interstate commerce," (4) "from the person or presence of

another," (5) "by force and violence or by intimidation." 18 U.S.C. § 2119. Chandler contests only the first element of this standard, claiming that he lacked the specific intent to harm Jeffries.

The Supreme Court has held that the first element may be satisfied by proof that the defendant possessed a "conditional intent" to cause death or serious bodily injury if such action was necessary to effectuate the carjacking. *Holloway v. United States*, 526 U.S. 1, 11-12 (1999). "A violation of the statute may . . . be established if the United States can show beyond a reasonable doubt that a defendant had the intent to kill or seriously harm his carjacking victim if the victim resisted, even if the victim did not in fact resist and no attempts to inflict such harm were made." *Fekete*, 535 F.3d at 477 (internal quotation marks omitted). Although this court has recognized that the proof needed for the first and fifth elements of the standard may overlap, it has cautioned that evidence of force or intimidation alone is not sufficient to meet the intent element. *Id.* at 478.

In considering the intent element, *Fekete* instructs us to "look at the totality of the circumstances to evaluate whether the defendant's words and actions sufficiently demonstrated a conditional intent to cause death or serious bodily harm." *Id.* at 481 (affirming Fekete's carjacking conviction after determining that Fekete possessed the specific intent to harm because circumstantial evidence indicated that the gun was loaded, and Fekete pointed a gun at the victim, threatened the victim, and presumably was aware that the car was occupied when he commandeered it). The scope of the circumstances that this court may consider remains unsettled. Some circuits, including this one, have held that the determination of the defendant's intent is limited to the specific moment in which he or she takes the vehicle. *See United States v. Guthrie*, 557 F.3d 243, 251-52 (6th Cir.

2009); *United States v. Matos-Quinones*, 456 F.3d 14, 19 (1st Cir. 2006) (collecting cases).  This interpretation arises out of language found in *Holloway*, in which the Supreme Court stated that "[t]he intent requirement of § 2119 is satisfied when the Government proves that *at the moment* the defendant demanded or took control over the driver's automobile the defendant possessed the [requisite] intent . . . ."  526 U.S. at 12 (emphasis added).

But this court has found no difficulty in ascertaining such intent by considering evidence about the gun used in the robbery that was not obtained until after the carjacking took place. Specifically, this court has considered the fact that a carjacking defendant fired his gun at a later time on the day in question as proof that the gun was loaded and thus constituted an actual threat at the time of the carjacking.  *See United States v. Adams*, 265 F.3d 420, 425 (6th Cir. 2001) (considering evidence that the defendant later fired shots at a police officer as evidence that the gun was loaded during the carjacking earlier that day).

Chandler asks us to consider an analogous circumstance favorable to him that occurred after the specific moment of the carjacking:  his reassurances to Jeffries that he would not harm her.  But even taking into account Chandler's reassurances, the government presented sufficient evidence to support Chandler's carjacking conviction.

We reach this conclusion in part because this circuit has previously stated that "physically touching a victim with a weapon, standing alone, is sufficient to justify a finding that the victim faces an imminent threat of physical harm, and indicates an intent on the part of the defendant to act violently."  *Id.*  This is true whether or not the government offers proof that the gun was loaded and

operable. *Fekete*, 535 F.3d at 479. To be sure, one can question whether there is any real distinction between physically touching a victim with a weapon and pointing the weapon at the victim from close range. We do not, however, have the authority to overrule this circuit's precedent on the point. *See Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985) (noting that "[a] panel of this Court cannot overrule the decision of another panel . . . unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision"); *see also* Sixth Cir. R. 206(c) ("Reported panel opinions are binding on subsequent panels. . . . Court en banc consideration is required to overrule a published opinion of the court.").

Moreover, Chandler did more than press his gun against Jeffries's side. He considered forcing her into the trunk of the car (itself having the potential to cause serious bodily harm) and ultimately directed her into the back seat at gunpoint, keeping his gun trained on her while his co-assailant drove around. Chandler further informed Jeffries that he and Benton "needed" the car. Such an alleged need suggests a willingness to harm the victim if necessary to procure the vehicle. Viewing all of this evidence in the light most favorable to the government, we conclude that the government has met the threshold for proving intent to harm.

But Chandler seizes upon language in *Fekete* to argue that, despite the above facts, there is insufficient evidence to support his conviction. *Fekete* commented that "[p]rior caselaw addressing the intent requirement . . . provides limited guidance as to whether a defendant can be convicted under the statute absent proof beyond a reasonable doubt that the firearm was loaded." 535 F.3d at

477. The evidentiary ambiguity noted in *Fekete* stems from *Holloway*, in which the Supreme Court asserted that an "empty threat" by the defendant would not be sufficient to satisfy the intent element of the carjacking statute. *Holloway*, 526 U.S. at 11. But the Supreme Court in *Holloway* did not explain what constituted such an empty threat, nor whether an unloaded gun was sufficient in and of itself to fall within this category. *Fekete*, 535 F.3d at 478. Chandler argues that the above quotation from *Fekete* indicates that his conviction may not be sound because the government failed to present evidence at trial that the gun was loaded and operable. Instead, the only evidence regarding the condition of the sole gun recovered at the McDonald's restaurant demonstrated that it was unloaded and inoperable. (The other gun used in the carjacking was never recovered.)

In *Fekete*, the defendant raised a similar issue to the one now being considered. He asked the panel to hold that, absent evidence of a physical touching by the gun, the government must prove that the firearm was loaded in order to establish "the intent to cause death or serious bodily harm." *See* 18 U.S.C.§ 2119. The panel in *Fekete* refused to reach this conclusion, leaving open the possibility that a defendant could possess the requisite intent even though the government did not furnish any such evidence. *Id.* at 480. But the *Fekete* panel cautioned that, "[a]bsent some additional evidence of bad intent, . . . evidence that a defendant brandished a firearm during a carjacking is insufficient on its own to establish a specific intent to kill or cause serious bodily harm." *Id.*; *see also United States v. Malone*, 222 F.3d 1286, 1291 (10th Cir. 2000) (suggesting that "if a defendant ordered a carjacking victim to do as he was told or he would be shot, while carrying an unloaded weapon, the intimidation element would be satisfied although the intent element might

not"); *United States v. Jones*, 188 F.3d 773, 777 (7th Cir. 1999) (same). Chandler now asks this court to define what it meant by this "brandishing-plus" requirement.

As in *Fekete*, however, we need not reach this issue because the district court found that the evidence presented at trial demonstrated that Chandler did in fact touch Jeffries with his gun, which removes this case from the category of the simple-brandishing cases mentioned in *Fekete*. The district court based this factual finding on Jeffries's testimony that one gun was pressed against her head and the other against her side as the defendants ordered her out of the car.

Chandler argues that the district court's finding was erroneous because Jeffries later stated that the guns were simply pointed at her. But this is an overly broad reading of the record. Jeffries at most gave conflicting testimony as to whether the guns touched her or were only pointed towards her. Because we must construe all credibility determinations and inferences in favor of the government as the prevailing party below, *Fekete*, 535 F.3d at 476, this ambiguity is not enough to undermine Jeffries's testimony that the guns were physically pressed up against her. Moreover, we review factual findings by the district court under the clear-error standard, which permits reversal only where "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *See United States v. Smith*, 594 F.3d 530, 535 (6th Cir. 2010) (internal quotation marks omitted). We are far from convinced that any such mistake occurred here.

Chandler, however, argues that this case should be described as one of "touching-minus" because of Chandler's subsequent reassurances to Jeffries. If this case truly presented a situation of "touching-minus," as characterized by Chandler, it would be a closer call. But the present case

includes evidence that Chandler both touched Jeffries with his gun and issued directives to her at gunpoint. The latter circumstance prevents this case from falling within the "touching-minus" category. We therefore conclude that the government presented sufficient evidence to prove Chandler's specific intent to cause serious bodily harm and thus to support his Count One carjacking conviction.

Because Chandler's carjacking conviction remains a valid underlying offense on which to base his firearm conviction, his challenge to the latter charge also fails. We therefore affirm Chandler's conviction under Count Two for using and carrying a firearm during and in relation to the carjacking offense.

## C.    Robbery affecting interstate commerce

Chandler's other sufficiency-of-the-evidence challenge is to his robbery conviction, which arose under the Hobbs Act. The Hobbs Act provides that "[w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion . . . shall be fined . . . or imprisoned . . . ." 18 U.S.C. § 1951(a). "Commerce," for purposes of the Hobbs Act, refers to the federal government's Commerce Clause power and "includes all . . . commerce over which the United States has jurisdiction." *United States v. Watkins*, 509 F.3d 277, 280 (6th Cir. 2007) (internal quotation marks omitted).

Where the robbery at issue affects a business entity, this circuit has consistently held that the government need demonstrate only a *de minimis* connection with interstate commerce to support a conviction under the Hobbs Act. *Id.* at 280-81; *see also United States v. Baylor*, 517 F.3d 899, 902

(6th Cir. 2008) (rejecting a challenge to the constitutionality of the *de minimis* standard following *United States v. Morrison*, 529 U.S. 598 (2000)); *United States v. Davis*, 473 F.3d 680, 681-83 (6th Cir. 2007) (rejecting the defendant's argument that the Hobbs Act requires a substantial-effect test where the robbery involves a business entity).

The *de minimis* standard is based on the rationale that the Hobbs Act regulates activities that, when aggregated, have a substantial effect on interstate commerce. *Davis*, 473 F.3d at 683. "Proof of a *de minimis* effect on interstate commerce, then, does not require the government to prove that a Hobbs Act robbery had an actual effect on interstate commerce, but only that there was a 'realistic probability' of such an effect." *Watkins*, 509 F.3d at 281 (citations omitted). This language has been construed to include even attempted robberies where the defendant did not in fact succeed in removing proceeds from the business establishment. *United States v. Brown*, 959 F.2d 63, 64-65, 67-68 (6th Cir. 1992) (involving the attempted robbery of a bar that was thwarted by a bar employee before the defendant reached the cash register).

The *de minimis* standard has also been deemed satisfied where the victimized business purchases or receives its products from an in-state distributor that in turn receives items from out of state. *See, e.g.*, *Davis*, 473 F.3d at 683-84 (interpreting *Brown* as holding that "[t]he *de minimis* standard was satisfied because the bar purchased some of its beer from an in-state distributor, which, in turn, purchased all of its beer from out-of-state manufacturers"); *Brown*, 959 F.2d at 68 ("[T]his fact [(the use of an in-state distributor)] does not so lessen the effect of these transactions on interstate commerce as to place them beyond the reach of the Hobbs Act. . . . Any fluctuation in the

amount purchased by these [] businesses in turn affected the amount of these items purchased in interstate commerce." (brackets and internal quotation marks omitted)).

The government may meet the *de minimis* standard even where the robbery involves only a small amount of cash, *see Baylor*, 517 F.3d at 900 (involving the robbery of a Little Caesar's pizza restaurant in which the defendant stole $538), or is a thwarted attempt where the business loses no money at all, *see Brown*, 959 F.2d at 68. Testimony that the restaurant received some of its products from out of state "alone is sufficient to satisfy the *de minimis* standard," even without evidence that the robbery caused the store to close or lose business. *See, e.g.*, *Baylor*, 517 F.3d at 903.

Chandler—as have several defendants before him—argues that the proper standard should be that the robbery had a "substantial effect," rather than a *de minimis* effect, on interstate commerce. But he relies primarily on a dissent from another circuit to support his argument. *See United States v. McFarland*, 311 F.3d 376, 377-410 (5th Cir. 2002) (Garwood, J., dissenting). Judge Garwood's dissent, however, is simply an insufficient basis for us to overrule a long line of precedent in this circuit. *See Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985). Moreover, Chandler's counsel was forthright at oral argument in conceding that he was raising this Commerce Clause argument simply to preserve it for possible review by the Supreme Court.

Chandler's final Hobbs Act challenges raise evidentiary issues that occurred during his bench trial. We conclude, however, that any alleged errors were harmless because the government presented sufficient food-distribution evidence to support Chandler's Count Three conviction under the Hobbs Act.

Finally, because we affirm Chandler's robbery conviction, his challenge to the related firearm conviction also fails. We therefore affirm Chandler's Count Four conviction for using and carrying a firearm during and in relation to the robbery.

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.