RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 10a0261p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
      *Plaintiff-Appellee/Cross-Appellant*
                  *(09-5094/5095),*

                  *v.*

WESLEY LANHAM (08-6504; 09-5094);
SHAWN FREEMAN (08-6506; 09-5095),
      *Defendants-Appellants/Cross-Appellees.*

Nos. 08-6504/6506;
09-5094/5095

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
Nos. 08-00005-002; 08-00005-003—Danny C. Reeves, District Judge.

Argued: March 5, 2010

Decided and Filed: August 24, 2010

Before: KEITH, BOGGS, and GRIFFIN, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Martin S. Pinales, STRAUSS & TROY, Cincinnati, Ohio, Randy J. Blankenship, BLANKENSHIP MASSEY & STEELMAN, PLLC, Erlanger, Kentucky, for Appellants. Conor B. Dugan, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Martin S. Pinales, Candace C. Crouse, STRAUSS & TROY, Cincinnati, Ohio, Randy J. Blankenship, C. Ed Massey, BLANKENSHIP MASSEY & STEELMAN, PLLC, Erlanger, Kentucky, for Appellants. Conor B. Dugan, Mark L. Gross, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

———————————

## OPINION

———————————

DAMON J. KEITH, Circuit Judge. Defendants Wesley Lanham ("Lanham") and Shawn Freeman ("Freeman") were convicted of violating an inmate's civil rights in

1

violation of 18 U.S.C. §§ 241 and 242, and making a false entry in violation of 18 U.S.C. § 1519. Defendants were prison jailers when prison inmate, J.S., was raped in jail. Defendants and their supervisor, Shawn Sydnor ("Sydnor"), decided to "scare" J.S. after he was arrested for committing a traffic violation, by placing him in a general population jail cell. Defendants now appeal their convictions and sentences, arguing that there was insufficient evidence to support their convictions, and Freeman claims that he was entitled to a downward sentencing departure. The government appeals the district court's application of the 2006 Sentencing Guidelines to Defendants' sentences and refusal to apply a sentencing enhancement to Lanham. For the reasons discussed herein, we **AFFIRM**.

## I. BACKGROUND

On February 14, 2003, Defendants Lanham and Freeman were working as corrections officers at the Grant County, Kentucky, Detention Center. Sergeant Shawn Sydnor and deputy jailers Jack Powell ("Powell"), Mark Coleman, Wendy Guthrie ("Guthrie"), and Lula Garrison were also working the same shift, which began on February 13, 2003, at 11 p.m. and ended on February 14, 2003, at 7 a.m. Lanham and Freeman were assigned to the Class D section of the Detention Center, and Sydnor was the supervisor that evening. That evening, J.S. was arrested for a traffic violation and brought to the Detention Center by Sheriff's Deputy Scott Allen. J.S. had been speeding and was arrested for eluding police. Deputy Allen told Sergeant Sydnor that J.S. had almost hit an off-duty police officer, who was Sydnor's friend.

J.S. was eighteen years old, six feet tall, and weighed around 125 pounds. He had blond highlights in his hair, wore a bright shirt, and had heart shapes on his undershorts. Sydnor described J.S. as a "[s]cared little kid" who was "[s]issy looking." (R. 91, Tr. at 51.) When J.S. arrived, Sydnor called Guthrie, Lanham, and Freeman to come to the booking room to look at J.S.'s hair. During booking, Sydnor, Lanham, and Freeman teased and laughed at J.S. The officers told J.S. that he looked "like a girl" and a "sissy," and they made fun of his highlighted hair and undershorts. (R. 91, Tr. at 54.) Sydnor told J.S. that he was "cute" and testified that he heard someone tell J.S. that he

would make a "good girlfriend for the inmates." (*Id.* at 55.) J.S. began shaking and crying. Powell testified that he asked J.S. "what he was thinking, wearing silk heart shaped boxers in jail on Valentine's Day." (R. 86, Tr. at 118.) Powell noted that "[i]t wasn't very smart because of the sexual content that could be brought because of it." (*Id.*) J.S. was booked at 1:05 a.m.

Sydnor told Lanham and Freeman that J.S. "needed to be scared." (*Id.*) Sydnor asked them to find J.S. a general population cell. Lanham stated that he "knew a guy down in 26 Hall" in Cell 101, Bobby Wright. (R. 91, Tr. at 57-58.) The inmates housed in 26 Hallway included those convicted of misdemeanors and felonies, and 26 Hallway was known as the "hallway from hell." (*Id.* at 59, 64.) Detention Center Nurse Sandy Cook ("Nurse Cook") described the inmates there as "almost . . . animalistic," noting that "there was so much testosterone . . . it was just a horrible place." (R. 93, Tr. at 29.) Sydnor testified that he was aware of instances of inmates expressing concern about sexual assault; that sexually predatory behavior occurred in the prison; and that 26 Hallway had more incidents of sexually predatory conduct than other areas of the jail. Jailer Guthrie testified that the Detention Center staff were aware of 26 Hallway's violent reputation.

Cell 101, which is located in 26 Hallway, housed felony-convicted prisoners, and there were between twelve and fourteen inmates in the cell that evening. Among the prisoners was Victor Zipp, who was known as an intimidating leader in the cell. Zipp was often naked, and guards frequently had to tell him to put on clothes. Lanham and Freeman had both worked in 26 Hallway prior to February 13, 2003. Earlier that evening, Freeman had assisted in the removal of an inmate from Cell 102 in 26 Hallway whom inmates had beaten up. Bobby Wright testified that the inmates in 26 Hallway were "pretty rowdy" and "were looking for anything to go down again." (R. 86, Tr. at 72.)

After Lanham volunteered that he knew an inmate in Cell 101, he and Freeman left booking and proceeded to 26 Hallway. After they left, Wendy Guthrie told Sydnor, "please don't put [J.S.] down there, somebody is going to beat him up." (R. 92, Tr. at

132-33.) Sydnor told her that it was none of her business and that he wore the sergeant's stripes. Lanham and Freeman proceeded to Cell 101. Inmate Wright went to speak to Lanham and Freeman, and there were other inmates around the door as well. Lanham and Freeman were both standing outside the door while they spoke to Wright. Lanham and Freeman told Wright they were going to bring J.S. down to Cell 101, and Lanham told Wright they wanted him to "f-ck with" J.S. Freeman shook his head up and down as Lanham spoke. The other inmates standing close to the door reacted with celebration. Neither Lanham nor Freeman told the inmates to avoid hurting J.S. Wright testified that the inmates began behaving in ways that he had never seen before immediately after the guards told the inmates to "f-ck with" J.S.

Lanham and Freeman returned to the booking area, and Lanham told Sydnor that he had spoken to Wright and that everything had been "taken care of." (R. 91, Tr. at 62.) Sydnor and Powell then escorted J.S. to Cell 101 in 26 Hallway. J.S. was crying. Sydnor testified that the inmates were "hollering" and being "rowdy and noisy." (R. 92, Tr. at 5.) J.S. overheard an inmate call out, "Oh, it's Valentine's Day, bring him here. He'd make a good girlfriend." (R. 86, Tr. at 37.) Powell heard an inmate describe J.S. as "pretty" and "cute." (*Id.* at 121.) Because of the sexual comments, Powell was concerned that this area was not safe for J.S. At least three or four inmates waited at the door when J.S. arrived and as he entered the cell. Some said things like, "He's so pretty, bring him in here. We've got a nice spot for him." (*Id.* at 38.) J.S. said he heard one of the guards say, "Here you go boys. I got some fresh meat for you." (*Id.* at 38-39.) A guard pushed J.S. into the cell and closed the door.

An inmate then grabbed J.S. around the arm and led him over to a bed. Inmates played with his hair, saying, "Oh it's so pretty. I love blond highlights. You look just like a girl." (*Id.* at 39.) Soon after, several inmates picked him up, started taking off his clothes, and slapped him with their prison flip-flops. J.S. called out for help numerous times, but no one responded. The inmates then dropped J.S. on his back and took him into the cell's shower area. The inmates pushed him against the shower wall and turned on the hot water; an inmate started beating his head against the wall. J.S. felt a strong

pain in his buttocks and believed he was being anally raped.  Eventually, J.S. got out of the shower and tried to run towards the door, but he fell on the floor.  Zipp came out of the shower area naked.  Some inmates picked J.S. up and started pressing his buttocks against the cell's window.  Zipp told J.S. he had two choices:  "Either get f-cked in the ass or suck my dick."  (*Id.* at 44.)  J.S. told him that he did not want to do either and said no several times.  An inmate came up behind J.S., punched him in the head, and forced him to open his mouth.  Zipp grabbed J.S. by the hair and forced his penis into J.S.'s mouth.  J.S. bit down as hard as he could, and Zipp withdrew.  An inmate hit him in the head again.  After that, J.S. was left alone.

The guards left J.S. in Cell 101 all night and never checked on him.  Later that morning, J.S. was brought to pretrial services.  J.S. saw the Detention Center's nurse, Nurse Cook, who testified that J.S. told her that "he had been traumatized and he been raped and he had been abused all night long." (R. 93, Tr. at 32.)  Around 10:00 a.m., J.S. learned that he would be released from the jail, and his father picked him up.  As they left, J.S. told his father that the jailers had placed him in a cell with other inmates, and that the inmates had raped him.  A day or two later, J.S.'s father brought him to St. Luke's Hospital where he was treated for abrasions inside his mouth, bruising on his left buttocks, and an abrasion on his left lower chin and lower left leg.

Subsequent to February 14, 2003, Lanham admitted that he spoke to Bobby Wright that night. Lanham admitted that the officers intended to scare J.S. and that they spoke to Wright about this.  He admitted that he participated in the plan for J.S. to be housed in Cell 101.  He also admitted that he knew that the guards had no control over what happened to J.S. after he was placed into Cell 101.  Several witnesses testified that the general population cells were not safe for someone without prison experience, and J.S. in particular.  Deputy Wendy Guthrie stated that she had no doubt that danger was awaiting J.S. when he was placed in Cell 101.  She was concerned that "he would get beat up." (R. 92, Tr. at 13.)  Nurse Cook testified that she did not believe that J.S. would have been safe in 26 Hallway because of its gang members, and that it was inappropriate

to house him there.  Inmate Wright testified that Lanham was aware that the prison housed violent felons.

During the shift beginning the night of February 14, 2003, Sydnor and the other officers learned that J.S. had been raped and beaten in the cell.  Sydnor fabricated a story and told Lanham and Freeman to say that they needed to move J.S. to the general population cells because the detox cells needed to be decontaminated.  However, J.S. was the only prisoner moved out of the detox cells that night, and Sydnor had told Lanham and Freeman nothing about the detox cell before J.S. was moved.  Sydnor and Powell then signed a false statement that stated that they put J.S. in Cell 101 because they were decontaminating the detox area.  Powell later testified that he never decontaminated a detox cell nor saw such decontamination that night.

Sydnor also told both Lanham and Freeman that they needed to get their stories straight about the previous shift and "to be on the same page," because they all "were in a lot of trouble."  (R. 92, Tr. at 17.)  In response, Lanham wrote and signed a false statement that the detox cells needed to be emptied on the morning of February 14, 2003, in order to clean them.  Lanham further wrote, falsely, that at the end of his shift, he asked Sydnor and Wright about J.S. and they told him that J.S. was fine.  Freeman wrote that he and Lanham left the booking area and that they passed through 26 Hallway to do "a secure check for Sgt. Sydnor."  Sydnor also told Guthrie to write a false statement, but she refused.

Sydnor, Lanham, and Freeman were subsequently arrested and charged with violating  J.S.'s civil rights and false entry.  Sydnor pleaded guilty to conspiracy to violate J.S.'s civil rights in violation of 18 U.S.C. § 242, and conspiracy to commit an offense against the United States in violation of 18 U.S.C. § 371.  The indictment in the present case against Sydnor was subsequently dismissed, and he cooperated with the government in its case against Lanham and Freeman.  After a jury trial, Freeman and Lanham were found guilty of conspiracy to violate J.S.'s civil rights in violation of 18 U.S.C. §§ 241 and 242, and making a false entry in violation of 18 U.S.C. § 1519.

The Probation Office prepared a Presentence Investigation Report ("PSR") for each defendant. The government and the defendants objected to the PSRs. The government argued that the more onerous 2008 Sentencing Guidelines applied rather than the 2002 Guidelines used in the PSR. The government also argued that a four-level upward adjustment for Lanham's role as an organizer or leader should apply pursuant to U.S.S.G. § 3B1.1.(a). The PSR proposed a two-level downward adjustment to Freeman's sentence, based on his minimal involvement, but that adjustment was objected to by the government and rejected by the district court. The district court rejected the government's request for an upward enhancement for Lanham's leadership role and refused to apply the 2008 Guidelines. The court sentenced Lanham to 180 months and Freeman to 168 months in prison.

## II. ANALYSIS

### 1. Jury Selection

#### A. *Standard of Review*

A district court's determinations during jury *voir dire* are reviewed for an abuse of discretion. *See United States v. Guzman*, 450 F.3d 627, 629 (6th Cir. 2006), *cert. denied*, 549 U.S. 1185 (2007) (citing *United States v. Phibbs*, 999 F.2d 1053, 1071 (6th Cir. 1993)). "Only in the case of manifest error will [this Court] overturn a finding of juror impartiality." *Id.* A district court's determination "regarding the credibility of jurors' assurances should receive substantial deference on appeal." *United States v. Corrado*, 304 F.3d 593, 604 (6th Cir. 2002). "[A] trial court's finding that a juror was impartial is entitled to a presumption of correctness, rebuttable only upon a showing of clear and convincing evidence." *Dennis v. Mitchell*, 354 F.3d 511, 520 (6th Cir. 2003).

#### B. *Merits*

The Sixth Amendment "guarantees an accused the right to be tried 'by an impartial jury.'" *Guzman*, 450 F.3d at 629 (quoting U.S. Const. amend. VI). "When a juror's impartiality is at issue, the relevant question is 'did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the

juror's protestation of impartiality have been believed.'" *Dennis*, 354 F.3d at 520 (quoting *Patton v. Yount*, 467 U.S. 1025, 1036 (1984)).

Defendants argue that the district court abused its discretion by declining to strike Jurors 56 and 143 for cause because both jurors expressed doubt concerning their ability to put aside news reports that they had read about the case. Defendants claim that neither juror was able to provide adequate assurances of impartiality. Juror 56 had read about the case in the newspaper and stated, "I haven't completely made up my mind, but based on what I've read, it's pretty made up." (R. 90, Tr. at 27.) Juror 56 concluded by saying, "[R]ight now I'm obviously not totally neutral. But I can certainly try." (*Id.* at 27.)

Juror 143 also admitted to having read news articles about the case and stated that he had an opinion about the case. (*Id.* at 38.) He stated, "It's hard not to read material like that without . . . making a judgment. On the other hand, I do believe I could make a judgment here based on what's presented. I really can't answer your question [about my belief in the defendants' guilty] yes or no, it's a degree." (*Id.* at 38.) Juror 143 continued that he could "compartmentalize" the knowledge from the article and stated that he would try his "darndest to do that." (*Id.* at 39.) But he also stated, "It's kind of a question, though, you can't really answer definitively." (*Id.*) Juror 56 concluded by saying, "[R]ight now I'm obviously not totally neutral. But I can certainly try." (*Id.* at 27.)

Neither Juror 56 nor Juror 143 were able to definitively state that they would be impartial and decide the case based on the facts presented at trial. Although they both stated that they would *try* their best to do so, they both wavered in their ability to be fair jurors. A "juror [must] give an affirmative promise of impartiality . . . [which is] believable in light of what the juror has revealed and the context of the case." *Holder v. Palmer*, 588 F.3d 328, 344 (6th Cir. 2009). In *Wolfe v. Brigano*, "the trial judge based his findings of [juror] impartiality exclusively upon each juror's tentative statements that they would *try* to decide this case on the evidence presented at trial." *Wolfe v. Brigano*, 232 F.3d 499, 503 (6th Cir. 2000) (emphasis added). This Court held

that "[s]uch statements, without more, are insufficient." *Id.* (citing *Goins v. McKeen*, 605 F.2d 947, 953 (6th Cir. 1979)).  Likewise, the noncommittal statements made by Jurors 56 and 143 were not a sufficient basis for finding impartiality, and the district court's failure to allow a for-cause challenge to these jurors was an abuse of discretion. Neither juror promised to remain impartial, and both seemed affected by the news accounts that they had read.  The trial court abused its discretion by denying Defendants' motion to strike these jurors for cause.

Nonetheless, Defendants have failed to demonstrate that any harm resulted from this abuse of discretion.  Jurors 56 and 143 were excluded from the final jury composition by Defendants' peremptory challenges.  Where a defendant uses a peremptory challenge to "cure" a district court's failure to excuse a juror for cause, and the defendant is "subsequently convicted by a jury on which no biased juror sat, he has not been deprived of any rule-based or constitutional right." *United States v. Martinez-Salazar*, 528 U.S. 304, 307 (2000); *see also McQueen v. Scroggy*, 99 F.3d 1302, 1321 (6th Cir. 1996) ("It is insufficient simply to claim that, had there been another peremptory available, a different juror would have been excluded, and the result might have been a more favorable jury.") (overruled on other grounds by *In re Abdur'Rahman*, 392 F.3d 174 (6th Cir. 2004) (en banc), judgment vacated by *Bell v. Abdur'Rahman*, 545 U.S. 1151 (2005)).  The case which Defendants rely on to support reversal on this ground, *Wolfe v. Brigano*, 232 F.3d at 500,  is inapposite to this case – the impaneled jury included four biased jurors who participated in the trial.  Here, in contrast, the biased jurors never participated in the trial and were removed through peremptory challenges.

Freeman also argues that the court improperly granted the government's request to strike Juror 88 for cause.  Juror 88 told the district court that she had worked with Freeman's attorney for fifteen years.  She stated that she worked with him on many occasions, had a good relationship with him, and would be sympathetic to him. Freeman argues that the district court's applied a different standard to the government when it requested a motion to strike for cause.  However, the district court was justifiably

concerned about the long-term and personal nature of Juror 88's relationship with defense counsel. This Court has held that "close and ongoing" relationships of jurors may be grounds for removing a juror for cause. *Wolfe*, 232 F.3d at 502.

For the foregoing reasons, the Defendants' have failed to show that there was an unconstitutional jury error.

## 2.     Limits on Cross Examination

### A.     *Standard of Review*

Defendants contest the limitations that the district court imposed on the cross-examination of Sydnor, including the prohibition of questions concerning certain details of Sydnor's cooperation agreement with the government. Trial counsel failed to object to the limitations on the cross-examination imposed by the district court that appellate counsel now challenges. Where trial counsel fails to object to a trial error raised on appeal, the plain error standard applies. *See United States v. Hadley*, 431 F.3d 484, 498 (6th Cir. 2005). To find that there was plain error, this Court must find that: 1) an error occurred in the district court; 2) the error was plain, *i.e.* obvious or clear; 3) the error affected the defendant's substantial rights; and 4) this adverse impact seriously affected the fairness, integrity or public reputation of the judicial proceedings. *See United States v. Koeberlein*, 161 F.3d 946, 949 (6th Cir. 1998).

### B.     *Merits*

At trial, the district court stated that, "the parties would be able to certainly ask questions about the defendant [Sydnor] entering a plea guilty in exchange for hoping to receive a lesser punishment [but] if it goes much beyond that, it may become objectionable." (R. 90, Tr. at 7.) Consequently, the jury was prevented from knowing the length of Sydnor's potential sentence, and Defendants' sentences as well. Defendants claim that their trial attorneys limited their questioning of Sydnor because of the court's order.

"The Confrontation Clause of the Sixth Amendment guarantees a defendant an opportunity to impeach the credibility of a witness against him because impeachment is fundamental to effective cross-examination." *United States v. Holden*, 557 F.3d 698, 704 (6th Cir. 2009) (citing *Davis v. Alaska*, 415 U.S. 308, 315-18 (1974)). Trial courts "retain great discretion to impose reasonable limits on the cross-examination of witnesses . . . ." *United States v. Davis*, 430 F.3d 345, 360 (6th Cir. 2005) (internal quotations and citations omitted). In determining whether a district court has abused its discretion in limiting cross-examination, this Court "must decide whether, despite the limitation of cross-examination, the jury was otherwise in possession of sufficient information . . . to make a 'discriminating appraisal' of a witness' motives and bias." *United States v. Kone*, 307 F.3d 430, 436 (6th Cir. 2002) (internal citations, quotations, and alterations omitted).

Because defense counsel failed to object to the limitation at trial, the plain error standard applies. There is a circuit split on the issue of whether defendants should be prohibited from asking cooperating witnesses, and former co-conspirators, details about their sentences and sentencing agreements with the government to expose the witnesses' bias, and the Sixth Circuit has not considered this issue in a published decision. *Compare United States v. Chandler*, 326 F.3d 210, 218-24 (3d Cir. 2003) (holding that the district court abused its discretion when it limited defendants' ability to cross-examine co-conspirators about their sentences) *with United States v. Cropp*, 127 F.3d 354, 358-59 (4th Cir. 1997) (holding the opposite). Where there are conflicting authorities, the district court could not have committed plain error. *See United States v. Williams*, 53 F.3d 769, 772 (6th Cir. 1995) ("[A] circuit split precludes a finding of clear error."). "At a minimum, court of appeals cannot correct an error . . . unless the error is clear under current law." *United States v. Olano*, 507 U.S. 725, 734 (1993). Because the law on this issue is not clear, the district court did not commit plain error.

Accordingly, the district court's determination is **AFFIRMED**.

**3.    Sufficiency of the Evidence**

  **A.    *Standard of Review***

In reviewing the sufficiency of the evidence to uphold a conviction, this Court asks "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime.'" *United States v. Jones*, 102 F.3d 804, 807 (6th Cir. 1996) (emphasis in original) (quoting *United States v. Swidan*, 888 F.2d 1076, 1080 (6th Cir. 1989)). The "defendant claiming insufficiency of the evidence bears a very heavy burden." *United States v. Fekete*, 535 F.3d 471, 476 (6th Cir. 2008) (internal quotations and citations omitted). "If we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, then the conviction must be upheld." *Id.*

  **B.    *Merits***

    *a.    Civil Rights Violations*

Lanham and Freeman contest their convictions for committing civil rights abuses in violation of 18 U.S.C. §§ 241, 242. Under 18 U.S.C. § 241, it is a crime when "two or more persons conspire to injure, oppress, threaten, or intimidate any person . . . in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same." This statute provides for enhanced penalties if the conspiracy's "acts include kidnapping or . . . aggravated sexual abuse . . . ." 18 U.S.C. § 241. Here, the indictment charged Lanham and Freeman with conspiring to injure J.S. and depriving him of his rights not to be deprived of liberty without due process. The indictment further charged that the conspiracy included sexual acts. "To obtain a conviction for conspiracy to violate civil rights under § 241, the government must prove that [defendants] knowingly agreed with another person to injure [the victim] in the exercise of a right guaranteed under the Constitution." *United States v. Epley*, 52 F.3d 571, 575-76 (6th Cir. 1995). The government also must prove beyond a reasonable doubt that there was specific intent to commit the deprivation. *Id.*

Under 18 U.S.C. § 242, "[w]hoever, under color of any law . . . willfully subjects any person . . . to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or law of the United States" has committed a federal crime. If "bodily injury results from the acts," the defendant shall be fined under this title or imprisoned not more than ten years, or both. *Id.* "[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (citation omitted). Prison officials are "not free to let the state of nature take its course [in a prison]." *Id.* "Prison conditions may be 'restrictive and even harsh,' but gratuitously allowing the beating or rape of one prisoner by another serves no 'legitimate penological objective.'" *Id.* (internal citations, quotations, and alterations omitted). A prison official can be found guilty where "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Ford v. County of Grand Traverse*, 535 F.3d 483, 495 (6th Cir. 2008) (quoting *Farmer*, 511 U.S. at 837)).

Lanham argues that J.S.'s sexual assault was not reasonably foreseeable and that there was insufficient evidence to support his conviction. However, the evidence established that Lanham joined Sydnor in mocking J.S. about his slight appearance, and he was present when Sydnor said that J.S. would make a "good girlfriend." When Sydnor stated that they needed to teach J.S. a lesson, Lanham quickly volunteered that he knew a prisoner in Cell 101. The evidence showed that Lanham talked to Inmate Wright, within earshot of other inmates, and explained that the guards would be bringing a new prisoner down and that they wanted the prisoners to "f-ck with" him. The evidence also showed that the inmates cheered at this news when Lanham was present, and Lanham knew of 26 Hallway's and Zipp's reputations.

Additionally, there was evidence that pretrial detainees were normally housed in the detox cells, not in the general population. Lanham stated that J.S. should have been in a detox cell and admitted that he asked Wright to teach J.S. a lesson. Finally, the evidence established that Lanham worked to cover up his actions after the fact. It is

immaterial that he was not at Cell 101 when J.S. was brought there because a conspirator "need not have personally performed the deed for which he is being held liable. A conspirator can be held criminally liable for the actions of his co-conspirators committed during and in furtherance of the conspiracy." *United States v. Gresser*, 935 F.2d 96, 101 (6th Cir. 1991) (citation omitted). Taken together, in the light most favorable to the prosecution, this evidence was adequate for a rational fact-finder to find that Lanham violated both 18 U.S.C. § 241 and 18 U.S.C. § 242. He acted with deliberate indifference and in furtherance of the conspiracy to place J.S. in harm.

Freeman also argues that the evidence was insufficient to support his conviction. Freeman taunted J.S., joined Lanham in taking action to solicit inmates to harm J.S., failed to check on J.S. throughout the five hours he was in Cell 101, and then joined in the cover up of his assault. Sydnor testified that he told both Lanham and Freeman of his plan to scare J.S., and that Freeman did not object to the plan. Officer Guthrie testified that Freeman was present during the discussion of the plan to scare J.S. Freeman went with Lanham to Cell 101 to solicit Inmate Wright's assistance in scaring J.S. "Although mere presence at the crime scene is insufficient to show participation, a defendant's participation in the conspiracy's common purpose and plan may be inferred from the defendant's actions and reactions to the circumstances." *United States v. Salgado*, 250 F.3d 438, 447 (6th Cir. 2001), *cert. denied*, 534 U.S. 936 (2001) (citation omitted).

Wright testified that while Lanham told him that they wanted him to "f-ck with" J.S., Freeman was standing at the door "agreeing with Lanham, shaking his head yes." The jury could reasonably have found that Freeman knew and intended to join the conspiracy to place J.S. in a general population cell to "scare" him. Freeman also failed to protect or assist J.S. after learning of the plan. Freeman testified that he had a duty to protect J.S., and his failure to do so could reasonably have been interpreted by the jury as acquiescence in the conspiracy. Viewing the evidence in the light most favorable to the prosecution, a rational fact-finder could find that Freeman participated in the conspiracy and violated the relevant statutes.

Furthermore, the record provides evidence that there was an objective risk of harm for someone like J.S. Although Freeman argues that Sydnor is the only person who knew that J.S. would be at risk if placed in the general population cells, Guthrie, Powell, and Nurse Cook all testified that J.S.'s placement in 26 Hallway was inappropriate. Guthrie testified that she was confident that J.S. would be assaulted; Powell testified about Victor Zipp's tendency to walk naked in the cell; and Nurse Cook testified that it was almost "animalistic" in 26 Hallway. A reasonable fact-finder could conclude that Freeman was aware of the objective risk of harm in placing J.S. in 26 Hallway.

Defendants took affirmative steps to place J.S. in harm and thus violated both statutes. Accordingly, their convictions are **AFFIRMED**.

### b.     The Cover-up

Lanham and Freeman also challenge their convictions for unlawfully falsifying their records in violation of 18 U.S.C. § 1519, which states "[w]hoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States . . . shall be fined under this title, imprisoned not more than 20 years, or both." Lanham argues that his incident report was not false because his supervisor, Sydnor, testified that the detox cells were in fact contaminated that night, and that there is a difference between a false statement and an omission. He claims that his report simply omitted information rather than affirmatively made false statements.

Sydnor testified that the detox cells "had an odor coming from them," but further stated that the odor would not "by itself" be a justification for moving J.S., and that the other inmate in the same detox cell was not moved that night. (R. 92, Tr. at 15.) This contradicted Lanham's written report, which claims that Sydnor "stated that he was going to start emptying our detox to get them cleaned." (Appellee's App. at 33.) Lanham also wrote that he went to 26 Hallway to speak to Wright about being

reclassified.  The evidence showed that Lanham went to 26 Hallway to tell Wright to "f-ck with" J.S.  Lanham himself admitted on cross-examination that his report was "inaccurate."  (R. 87, Tr. at 19.) Sydnor testified that he told Lanham and Freeman that they should report that the detox cells needed to be decontaminated *after* learning that J.S. was raped in Cell 101.  This is sufficient evidence for a rational fact-finder to find that Lanham intentionally falsified his reports.

Freeman argues that his report contained omissions of fact rather than affirmative lies.  Freeman wrote that he and Lanham went to some prisoners in 26 Hallway and then returned "to Class D . . . [and] went to 26 Hall [and] did a secure check for Sgt. Sydnor." (Appellee's App. at 32.)  These statements were false.  In fact, Freeman returned to booking after talking with Wright, rather than proceeding immediately to Class D as stated in the written report.  Material omissions of fact can be interpreted as an attempt to "cover up" or "conceal" information.  A reasonable fact-finder could conclude that Freeman falsified his report.

Lanham also argues that there had to be an ongoing or imminent federal investigation at the time the reports were written to meet the requirements of the statute. The language in 18 U.S.C. § 1519 clearly states that the falsification could be done "in relation to or contemplation of any" investigation or matter within United States jurisdiction.  The conspiracy to harm J.S. was within the jurisdiction of the United States, and the falsification was presumably done in contemplation of an investigation that might occur.  A reasonable fact-finder could find that Sydnor warned Lanham and Freeman that they had to get their stories straight in anticipation of an investigation of J.S.'s rape.

For the aforementioned reasons, the convictions for falsification of records are **AFFIRMED**.

####     *c.      Sexual Assault Enhancement under 18 U.S.C. §§ 241, 242*

Defendants were charged under 18 U.S.C. § 241 for conspiring to violate J.S.'s civil rights. The indictment charged that the acts in furtherance of the conspiracy included aggravated sexual abuse. The statute establishes a ten year maximum sentence for those convicted under the statute, and includes an increased penalty of "any term of years or for life," if the conspiracy included an act of "aggravated sexual abuse." Because the question of whether an act of sexual abuse occurred is a factual issue that "increases the penalty" for the violation of 18 U.S.C. § 241 "beyond the prescribed statutory maximum," the question was required to be "submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). The district court properly submitted the question of whether aggravated sexual abuse occurred to the jury, adopting the definition of aggravated sexual abuse found in 18 U.S.C. § 2241 (1998).

Defendants' argument that their conduct had to meet the jurisdictional requirements of aggravated sexual abuse in 18 U.S.C. § 2241, which require that the abuse occurred in a federal prison, is without merit. They were not charged under that statute, and the district court was merely giving content to the term "aggravated sexual assault" by using the definition in 18 U.S.C. § 2241. The jurisdictional requirements of 18 U.S.C. § 2241 did not apply because they were not prosecuted under this statute. Accordingly, the sexual assault enhancement is **AFFIRMED**.

**4.     Mitigating Role Adjustment to Freeman's Sentence**

This Court reviews a "district court's denial of a mitigating role adjustment to a defendant's offense level for clear error." *Salgado*, 250 F.3d at 458. "To be clearly erroneous, . . . a decision must strike [this Court] as more than just maybe or probably wrong; it must strike us as wrong with the force a five-week-old, unrefrigerated dead fish." *United States v. Perry*, 908 F.2d 56, 58 (6th Cir. 1990) (internal citations, quotations, and alterations omitted).

U.S.S.G. § 3B1.2(b) directs courts to reduce a defendant's offense level by two levels where defendant "was a minor participant in any criminal activity."  This Court has held, "[t]he 'minor participant' reduction is available only to a party who is 'less culpable than most other participants' and 'substantially less culpable than the average participant.'"  *United States v. Lloyd*, 10 F.3d 1197, 1220 (6th Cir. 1993) (quoting U.S.S.G. § 3B1.2, cmt. n.3).  The district court rejected the role reduction for Freeman, stating:  "While he did not have as much of a speaking role, his activities, first his knowledge of what was going on and his participation in the agreement of defendants was substantial.  He added weight to Mr. Lanham's statements and, as indicated during trial, he indicated agreement with the activities that were being requested by Mr. Lanham.  And under those circumstances, the Court believes it would be improper to reduce his role as a minor or minimal participant." (R. 142, Tr. at 9.)  Freeman's actions were deliberately indifferent, and after the rape he was an active participant in the cover-up of the crime.  The district court's findings were not clearly erroneous.  Accordingly, Freeman's sentence is **AFFIRMED**.

### 5.    Freeman's *Brady* Motion

Under *Brady v. Maryland*, 373 U.S. 83 (1963), the government is required "to disclose exculpatory and impeachment evidence that is 'material either to guilt or to punishment.'"  *Doan v. Carter*, 548 F.3d 449, 459 (6th Cir. 2008) (quoting *Strickler v. Greene*, 527 U.S. 263, 280 (1999)).  "A *Brady* violation includes three elements:  (1) the evidence must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued."  *Id.*  Evidence is "material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of proceeding would have been different." *Id.* (internal citation and quotations omitted).

Freeman argues that the government "did not disclose to [the] defense that Chandler had told them that the video depicted Shawn Freeman at a cell other than Cell 101," and the "FBI was aware of this information and failed to disclose it."  (Appellant

Freeman's Second Br. at 57.)   This evidence presumably would have shown that Freeman was not present when Lanham approached Wright about J.S.   Assuming, *arguendo*, that this evidence was deliberately or inadvertently withheld, Freeman is unable to show that he was prejudiced by such withholding.

Inmate Wright testified that Freeman was with Lanham, and that Freeman nodded his head in agreement with Lanham's statements. Freeman himself corroborated Wright's testimony that he shook his head while Lanham asked Wright to "f-ck with" J.S.  Whether Freeman was standing in Cell 98 or 99, or 96 as Chandler originally stated, is immaterial when there is significant corroboration of Wright's testimony that Freeman was there nodding his head when Lanham was telling Wright to "f-ck with" J.S. Accordingly, there was no prejudice, and the district court properly held that no *Brady* violation occurred.  As such, the district court's determination is **AFFIRMED**.

**6.     Applicable Sentencing Guidelines**

The sentencing court is to apply the version of the Sentencing Guidelines in effect at the time of sentencing unless it "determines that use of the Guidelines Manual in effect on the date that  the defendant is sentenced would violate the ex post facto clause."  U.S.S.G. § 1B1.11(b)(1).

Defendants committed their offenses in 2003 when the 2002 Guidelines were in effect at the time of the crime.  The 2008 Guidelines, in effect at time of sentencing, establish a higher base offense level for the offense of Criminal Sexual Abuse.  The government argues that using the 2008 advisory Guidelines, which established a more onerous offense level than that in effect on the date of  crime, would not violate the Ex Post Facto Clause under the new post-*Booker* advisory Guidelines regime.  The Ex Post Facto Clause "bars application of a law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed." *Johnson v. United States*, 529 U.S. 694, 699 (2000) (internal citations and quotations omitted).

The Supreme Court has interpreted the Ex Post Facto Clause to bar  retroactive application of a revised version of a state's sentencing guidelines, *Miller v. Florida*, 482

U.S. 423 (1987), and this Court applied that decision to the federal Sentencing Guidelines, see *United States v. Kussmaul*, 987 F.2d 345, 351-52 (6th Cir. 1993).  The government argues that this legal precedent no longer applies because, post-*Booker,* the Sentencing Guidelines are advisory rather than mandatory.  Although this Court has not directly determined whether the now advisory Guidelines regime implicates Ex Post Facto concerns, there is some case law in support of holding that it does.  This Court has acknowledged that "[t]he presence of discretion does not displace the protections of the Ex Post Facto clause."  *Michael v. Ghee,* 498 F.3d 372, 382 (6th Cir. 2007).  When evaluating the reasonableness of a sentence, the reviewing court must consider the applicable Guidelines range and failure to do so is "reversible error."  *See United States v. Kosinski*, 480 F.3d 769, 779 (6th Cir. 2007).  The Sentencing Guidelines are still relevant and are a starting point for determining a defendant's sentence.  Only when the Guidelines range is unable to meet the goals of the Sentencing Guidelines is a sentencing court expected to vary from the Guidelines sentence.  18 U.S.C. § 3553(a).  As a result, the advisory nature of Guidelines does not completely eliminate Ex Post Facto concerns.  Ironically, the government is presumably interested in having the 2008 Guidelines apply because it would impact Defendants' sentence, which demonstrates the Ex Post Facto concerns that come into play when retroactively applying the 2008 Guidelines.  Accordingly, the district court's determination is **AFFIRMED**.

**7.      Leader or Organizer Enhancement to Lanham's Sentence**

When a "defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive," the offense level is increased by four levels.  U.S.S.G. § 3B1.1(a).  The Sentencing Guidelines direct the court to consider facts such as "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others."  U.S.S.G. § 3B1.1, cmt n.4.

The district court stated that it would not apply the enhancement because "[u]nder the facts of this particular case, it would not appear that the initial idea for the punishment of victim was Mr. Lanham's idea." (R. 143, Tr. at 10.) The government argues that the district court committed legal error in overemphasizing the fact that Lanham did not originate the conspiracy. However, this fact is significant in assessing his "exercise of decision making authority,"the "nature of [his] participation in the commission of the offense," "the degree of participation in planning or organizing the offense," and "the degree of control and authority exercised over others." U.S.S.G. § 3B1.1, cmt n.4.

The district court stated that "looking at all participants in the case and the instructions that were given, the Court believes that while it is a close question, the Court will not apply an adjustment for role in the offense based on the facts that are presented." (R. 143, Tr. at 10-11.) The district court did not commit legal error in holding that Lanham did not act as an organizer. Lanham exercised limited decision-making authority, did not originate the plan, did not actively participate in bringing J.S. to Cell 101, and did not exercise control over the other jailers in ensuring that the plan was exercised. Under these facts, the district court's determination was not a legal error and the decision to deny the enhancement is **AFFIRMED**.

## III. CONCLUSION

For the foregoing reasons, Defendants' convictions and sentences are **AFFIRMED**.