**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 15a0245n.06

Nos. 13-6536/14-5168

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Apr 07, 2015

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff-Appellee,** | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| LEREGINALD STRONG (13-6536); | ) | DISTRICT OF TENNESSEE |
| JOSEPH BANKS (14-5168), | ) | |
| | ) | |
| **Defendants-Appellants.** | ) | **OPINION** |
| | ) | |
| | ) | |

**Before: BATCHELDER, MOORE, and SUTTON, Circuit Judges.**

**KAREN NELSON MOORE, Circuit Judge.** As Albert Hall returned home on October 23, 2012, he noticed two men walking down his street. After pulling into his driveway, Hall got out of his car and walked towards his house. He turned around after hearing footsteps behind him, and found himself confronted by one of the two men, who was now pointing a taser and gun at him. The other man stood to the side, serving as a lookout. Hall quickly suspected that these men were after his car—a Lexus GS 300.

A brief scuffle ensued, during which Hall lost his car keys. Hall eventually fled across his backyard, and was shot at while jumping over a gate. He fell immediately to the ground, playing dead. After the two men drove off in Hall's car, Hall notified the police. Shortly afterward, officials apprehended Lereginald Strong and Joseph Banks, who were caught in a

high-speed chase driving Hall's Lexus and wearing the same outfits as the carjackers whom Hall had described to police earlier that morning.

A jury later determined that Banks had shot at Hall, and convicted him of one count of carjacking, *see* 18 U.S.C. § 2119, one count of aiding and abetting the use and carrying of a firearm during and in relation to a crime of violence (and brandishing and discharging that firearm), *see* 18 U.S.C. § 924(c), and two counts of being a felon in possession of a firearm, *see* 18 U.S.C. § 922(g)(1). The jury convicted Strong of one count of carjacking, *see* 18 U.S.C. § 2119, one count of aiding and abetting the use and carrying of a firearm during and in relation to a crime of violence (and brandishing and discharging that firearm), *see* 18 U.S.C. § 924(c), and one count of being a felon in possession of a firearm, *see* 18 U.S.C. § 922(g)(1). The district court sentenced Banks to 420 months of imprisonment and Strong to 372 months of imprisonment. Both Banks and Strong appeal their convictions and sentences. For the following reasons, we **AFFIRM** Banks's and Strong's convictions and sentences.

## I. BACKGROUND

Shortly after Hall gave a statement to police, Officer Keith Murden heard a call on his police radio about a carjacking, and learned that the vehicle's "last known direction was towards Summer," an area that Murden was then patrolling. R. 84 (Trial Tr. at 532) (Page ID #744). Murden soon spotted a blue Lexus matching the description that he had just heard, and turned on his siren. Instead of slowing down, however, "the vehicle took off," and a high-speed chase ensued, with several other police cruisers eventually joining in pursuit. *Id.* at 532–33 (Page ID #744–45). About three or four minutes later, the Lexus crashed into another car, ending the

chase. Banks was removed from the driver's seat and Strong from the passenger's seat, and both were placed under arrest. Officers also found a black semi-automatic handgun on the floorboard of the driver's seat and a brown-handled revolver on top of the passenger's seat.

A federal grand jury returned an indictment charging both Banks and Strong with one count of carjacking in violation of 18 U.S.C. § 2119 and one count of aiding and abetting each other in the use and carrying of a firearm in violation of 18 U.S.C. § 924(c). Banks was also charged separately with two counts of being a felon in possession. A superseding indictment added the element of brandishing to Banks's and Strong's 924(c) charges, and added Strong to one of the felon-in-possession counts.

Both defendants proceeded to trial. During voir dire, the government objected to the defense's decision to exercise peremptory strikes against Jurors Friend, Carney, and Roberts. The district court engaged in a *Batson* inquiry, and determined that the defense had presented sufficiently valid reasons for striking Carney and Roberts. It concluded, however, that defense counsel had provided insufficient justification for its decision to strike Friend, and sustained the government's *Batson* challenge. In reaching this determination, it noted that the race-neutral explanations given by the defense were "poorly supported," R. 83 (Trial Tr. at 317) (Page ID #529) and "pretextual," *id.* at 318 (Page ID #530). Banks and Strong were convicted of all counts at the end of a four-day trial.

On appeal, both Banks and Strong challenge the district court's *Batson* decision. Separately, Banks alleges (a) that the district court erred by allowing Officer Harris to identify his voice on a series of telephone calls made from the Shelby County Jail, (b) that the evidence

was insufficient to convict him of carjacking, (c) that the district court erred in finding him to be a career offender, and (d) that the district court improperly applied the attempted-murder cross-reference provision to him. Strong alleges (a) that the evidence was insufficient to convict him of aiding and abetting the carjacking, (b) that the evidence was insufficient to convict him of aiding and abetting the brandishing and discharge of a firearm during and in relation to a crime of violence, and (c) that the district court improperly applied the attempted-murder cross-reference provision to him. Because Banks and Strong have asserted the same *Batson* claim, we analyze that claim first. We then examine Banks's and Strong's other claims separately.

## II. *BATSON* CLAIM

The Equal Protection Clause guarantees defendants "the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria." *Batson v. Kentucky*, 476 U.S. 79, 85–86 (1986). "*Batson* applies to peremptory challenges based on race or gender," *United States v. Kimbrel*, 532 F.3d 461, 466 (6th Cir. 2008), and each party may challenge the other side's decision to strike a potential juror, *see Georgia v. McCollum*, 505 U.S. 42, 59 (1992).

"We review a district court's determination of a *Batson* challenge with 'great deference,' under a clearly erroneous standard." *United States v. Copeland*, 321 F.3d 582, 599 (6th Cir. 2003) (quoting *United States v. Buchanan*, 213 F.3d 302, 308–09 (6th Cir. 2000)). "Deference is necessary because a reviewing court, which analyzes only the transcripts from *voir dire*, is not as well positioned as the trial court is to make credibility determinations." *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003). Deference, however, "does not imply abandonment or abdication of

4

judicial review," *id.* at 340, as "deference, by definition, does not preclude relief," *United States v. McAllister*, 693 F.3d 572, 578 (6th Cir. 2012).

"A *Batson* challenge entails three distinct and sequential steps: (1) the opponent of the peremptory strike must make a prima facie case that the challenged strike was based on race; (2) the burden then shifts to the proponent of the peremptory challenge to articulate a race-neutral explanation for the strike; (3) finally, the trial court must determine whether the opponent of the peremptory strike has proven purposeful discrimination." *Id.*

At step one, the government must "show that the relevant circumstances raise an inference that the proponent of the strike excluded prospective jurors from the petit jury because of their race." *Kimbrel*, 532 F.3d at 466 (internal quotation marks omitted). The government has satisfied this requirement: it pointed out at voir dire that nine out of defense counsel's ten strikes had been used against white jurors. We have held before that, although similarities between excluded jurors cannot constitute a *Batson* violation per se, they can be a factor supporting an inference of discrimination. *See United States v. Sangineto-Miranda*, 859 F.2d 1501, 1521–22 (6th Cir. 1988).

We also believe that the defense offered a facially-valid race-neutral explanation for its decision to strike Friend—that Friend had been staring at Strong and that Friend had previously worked with another juror. We have observed that "the trial court cannot inquire at step two—where the proponent's burden is merely to provide a facially valid explanation—whether the explanation is 'plausible' or even 'minimally persuasive.'" *Kimbrel*, 532 F.3d at 466 (quoting

*Purkett v. Elem*, 514 U.S. 765, 768 (1995)).  The explanation given can be "silly" or even "superstitious," so long as it is race-neutral.  *Purkett*, 514 U.S. at 768.

Finally, we must determine whether the trial court clearly erred in finding purposeful discrimination.  We begin by examining the two explanations offered by the defense.  First, defense counsel pointed out that he thought Friend worked for Robertson, another juror.  *See* R. 83 (Trial Tr. at 301) (Page ID #513).  The district court corrected counsel, stating that "[h]e doesn't work with her now.  He used to.  She was part of the hiring process, she was not a supervisor for him, and they do not currently work together."  *Id.*  The district court went on to restate that "[Friend] no longer works for her, they no longer see each other," before finding that "I don't think we get over [step] number two.  I think we just didn't get over it.  Now, if we crawled over—if we got over number two . . . then you have the [sic] to say at step three, has the proponent produced a facially valid explanation[?] . . . [T]his [explanation] doesn't appear to be supported by any basis in fact, it appears to be invalid and, therefore, it seems to be pretextual."  *Id.* at 318 (Page ID #530).  Given this discussion, we think that the district court properly weighed defense counsel's explanation regarding Friend's working relationship to the other juror and found it wanting.

Strong and Banks also argue that Friend stared at Strong during voir dire.  The district court stated in contrast that "[t]he court didn't make this observation.  In fact, the court would have to say that I was talking to Mr. Friend and watching Mr. Friend, I didn't see any of this.  I think I probably would have.  I certainly noticed what was going on as to Ms. Roberts, and that was clear."  *Id.* at 316 (Page ID #528).  The district court went on to describe defense counsel's

characterization as "very subjective," "very, very weak," and "inherently problematic." *Id.* It ultimately found this explanation pretextual, stating that "[t]he reason it appears to have been [pretextual] is that Mr. Friend, who of all of our jurors, is actually remarkably white. He's just plain pale. He makes Mr. Sullivan [defense counsel] and me look like we're rosy complected [sic]. That probably sounds bad, but he's just very pale, so, unfortunately, I don't know that that had anything to do with it." *Id.* at 318–19 (Page ID #530–31).

We note, as a threshold matter, that staring at a defendant may constitute a valid race-neutral explanation for excluding a potential juror. *See United States v. Turner*, 674 F.3d 420, 436 (5th Cir. 2012); *see also McCurdy v. Montgomery Cnty.*, 240 F.3d 512, 521 (6th Cir. 2001) ("[B]ody language and demeanor are permissible race-neutral justifications for the exercise of a peremptory."). We also note, however, that "determinations of credibility and demeanor lie peculiarly within a trial judge's province," and, "in the absence of exceptional circumstances, we would defer to [the trial court]." *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008) (internal quotation marks omitted).

With these two considerations in mind, we hold that the district court did not clearly err in finding purposeful discrimination. To be clear, our decision should not in any way be read as an endorsement of the district court's comments regarding Friend's paleness, which even it seemed to acknowledge were inappropriate. In fact, we strongly disapprove of the statements regarding relative skin tones that the district court made, and believe that it could have addressed the government's *Batson* claim in any number of different (and more appropriate) ways. On the whole, however, it appears that the district court considered the relevant arguments made by both

parties and had a reasonable basis for finding defense counsel's explanation to be weak and implausible. The district court, for example, stated that it had personally not seen Friend staring at Strong, even while the district court "was talking to Mr. Friend and watching Mr. Friend" during voir dire. R. 83 (Trial Tr. at 316) (Page ID #528). By contrast, in rejecting the government's *Batson* challenge with respect to Roberts, the district court noticed and noted Roberts's affect. In addition, the district court acknowledged that "when you get to *Batson* challenges, the courts are reluctant, because the way it is organized in terms of the burden of proof, you got to prove a whole lot." *Id*. at 319 (Page ID #531). The district court concluded that the government had met its burden in this case, a finding that the court made while having the advantage of "observing the voir dire, [of] knowing the layout of the courtroom better than a written description can provide, and [of] being able to consider the demeanor of [defense counsel] as he made his explanation." *Turner*, 674 F.3d at 436. Despite our strong reservations regarding some of the comments made by the district court, we conclude that the district court did not clearly err in its *Batson* determination to seat Friend on the jury notwithstanding defense counsel's peremptory challenge.

### III. BANKS'S CLAIMS

#### A. Admissibility of Jail Calls

Banks contends that the district court improperly admitted testimony identifying his voice on a series of outbound phone calls made from the Shelby County Jail. Specifically, he alleges that the government failed to establish the foundation for the introduction of such evidence because its witness, Officer Juaquatta Harris, was not personally familiar with his voice.

We review the district court's admission of Officer Harris's testimony for abuse of discretion. *United States v. DeJohn*, 368 F.3d 533, 542 (6th Cir. 2004). At trial, Officer Harris testified at length about how she isolated, traced, and identified the calls specific to Banks. Some of these calls were made using Banks's Record and Identification (R&I) number, a unique number assigned to each inmate. Others (including those at issue here) were made from a general intake area, where inmates do not need to enter their R&I number but can make only outgoing calls. Harris linked these calls to Banks's R&I calls by examining the numbers called and by listening in on the conversations that took place during these calls to pick up on any identifying information.

Although Harris was not personally familiar with Banks's voice, there are nonetheless sufficient indicia of reliability here to support admissibility. The Federal Rules of Evidence allow opinions identifying a person's voice "based on hearing the voice *at any time under circumstances* that connect it with the alleged speaker." Fed. R. Evid. 901(b)(5) (emphasis added). Such circumstances exist here: the calls at issue were made to Banks's mother, while Banks was in custody, concerning the carjacking that had occurred earlier that day. Officer Harris had gained familiarity with Banks's voice by hearing him identify himself on a separate call using his R&I number. *See United States v. Cruz-Rea*, 626 F.3d 929, 935 (7th Cir. 2010) (upholding district court's decision to admit identification testimony based on officer's becoming familiar with defendant's voice through fifteen-second voice exemplar).

Banks's reliance on the First Circuit's decision in *Ricci v. Urso*, 974 F.2d 5, 7 (1st Cir. 1992), is misplaced. As the First Circuit later explained in *United States v. Brown*, 510 F.3d 57,

68 (1st Cir. 2007), the *Ricci* court found the voice identification in that case to be unreliable because "the officer made the recording on a hand-held recorder" and "had no expert training in voice identification." Here, Officer Harris culled the records through an established electronic monitoring system. She was able to compare multiple samples of Banks's voice against one another. The subject matter of the conversations pointed directly to Banks. In light of these facts, the district court did not abuse its discretion in allowing Officer Harris to testify at trial.

**B. Sufficiency of the Evidence to Support Banks's Carjacking Conviction**

Banks next argues that the evidence was insufficient to convict him of carjacking. "We review a claim of insufficient evidence in the light most favorable to the government." *United States v. Fekete*, 535 F.3d 471, 476 (6th Cir. 2008). Our review is limited to "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). "To obtain a conviction for carjacking, the government must prove that the defendant, (1) with intent to cause death or serious bodily harm, (2) took a motor vehicle, (3) that had been transported, shipped, or received in interstate or foreign commerce, (4) from the person or presence of another (5) by force and violence or intimidation." *Fekete*, 535 F.3d at 476 (citing 18 U.S.C. § 2119).

Banks here contests only the first element—intent. On this point, we have held "that physically touching a victim with a weapon, standing alone, is sufficient to justify a finding that the victim faces an imminent threat of physical harm, and indicates an intent on the part of the defendant to act violently." *United States v. Adams*, 265 F.3d 420, 425 (6th Cir. 2001). In

*Adams*, the defendant approached the victim and pointed a firearm at her. The victim fell to the ground after a brief skirmish. The victim left her keys in her car; after picking up some of the victim's money, which had fallen to the ground, the defendant entered the victim's car and drove away. *Id.* at 422. We upheld defendant's conviction for carjacking in *Adams* against a sufficiency-of-the-evidence challenge.

This case involves facts that are even more egregious. According to Hall, Banks approached him with gun drawn. Hall and Banks engaged in a scuffle, during which Banks used a taser in an attempt to subdue Hall. When this failed (i.e., Hall was able to push himself off of Banks and run away), Banks drew his gun and tried to shoot Hall. Apparently, believing Hall to be dead, Banks then retrieved Hall's keys, and drove off with Strong. After placing Banks and Strong under arrest, police uncovered, among other things, a loaded revolver in Hall's car. *See also Holloway v. United States*, 526 U.S. 1, 12 (1999) ("The intent requirement of § 2119 is satisfied when the Government proves that at the moment the defendant demanded or took control over the driver's automobile the defendant possessed the intent to seriously harm or kill the driver if necessary to steal the car (or, alternatively, [even] if unnecessary to steal the car).").

Banks's contentions to the contrary are unavailing. Banks's first argument—that his use of a taser was indicative of his intention to use non-lethal force—is meritless. Banks did in fact use lethal force, after he found the taser to be ineffective. Second, Banks argues that Hall testified that Banks shot at him with a semi-automatic pistol, but a later examination revealed that the only cartridge discharged was from a revolver. This distinction is insignificant, given that Hall was fleeing from Banks, with his back turned, at the time of the shooting. The jury

11

found, beyond a reasonable doubt, that Banks had discharged *a* firearm during the commission of this offense. Finally, Banks points to two cases from our sister circuits—*United States v. Applewhaite*, 195 F.3d 679 (3d Cir. 1999), and *United States v. Harris*, 420 F.3d 467 (5th Cir. 2005)—to argue that, in order to show carjacking, "the defendant must intend harm *in order to complete the theft of the car." United States v. Washington*, 702 F.3d 886, 892 (6th Cir. 2012) (summarizing cases). In other words, the government must prove that Banks approached Hall in order to steal Hall's car, and that the theft did not simply occur as an after-the-fact consequence of an altercation gone awry. We were presented with this very same argument in *United States v. Washington*. We declined, in that case, to endorse this interpretation of § 2119, and we see no reason to do so here. More importantly, we would find the evidence more than sufficient to convict Banks of carjacking even under such an interpretation. Banks and Hall did not know each other, Hall drove a Lexus—a vehicle he described as "very noticeable," R. 84 (Trial Tr. at 397) (Page ID #609), and Banks left the scene immediately after he retrieved Hall's keys. All of these facts suggest that Banks intended to harm Hall in order to steal Hall's car.

## C. Career-Offender Enhancement

Banks also objects to the district court's classification of him as a career offender under the Sentencing Guidelines. Under the Guidelines,

> A defendant is a career offender if (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

U.S.S.G. § 4B1.1(a). Banks does not dispute (1) or (2). Nor does he contest that his prior conviction for manslaughter (originally charged as first-degree murder) constitutes a crime of violence. The only remaining question is whether Banks's Class E felony conviction for evading arrest under Tennessee law is also a crime of violence. We determined, in *United States v. Doyle*, 678 F.3d 429, 437 (6th Cir. 2012), that such convictions were violent felonies under the Armed Career Criminal Act ("ACCA"). We held that the felony in question—Tennessee Code Annotated § 39-16-603(b)(1)—fell within the ACCA's residual clause, which classifies crimes as being violent felonies if they are "punishable by imprisonment for a term exceeding one year" and "involve[] conduct that presents a serious potential risk of physical injury to another." *Id.* at 431. That same reasoning applies to this case; indeed, the residual clauses in the ACCA and in the career-offender provision are identical to one another. *Compare* U.S.S.G. § 4B1.2(a)(2), *with* 18 U.S.C. § 924(e)(2)(B)(ii).[1] The district court properly found Banks to be a career offender.

**D. Application of Cross-Reference Provision for Attempted Murder**

Banks also faults the district court for its decision to calculate his base offense level by cross-referencing his conviction for felon in possession with attempted murder. We review the district court's legal interpretation of the Guidelines de novo, *United States v. Settle*, 414 F.3d 629, 630 (6th Cir. 2005), but "accept factual findings made by the district court at sentencing unless they are clearly erroneous." *United States v. Phillips*, 516 F.3d 479, 483 (6th Cir. 2008).

---

[1]The Supreme Court recently heard argument in *Johnson v. United States*, 134 S. Ct. 1871 (2014), a case where petitioners challenged the constitutionality of the ACCA's residual clause. Pending the result in that case, we invite Banks to revisit our decision today by filing a petition for a writ of certiorari.

Section 2K2.1, the Guidelines provision for felon-in-possession offenses, contains a cross-reference provision that applies whenever the "defendant use[s] or possesse[s] any firearm or ammunition cited in the offense of conviction in connection with the commission or attempted commission of another offense." U.S.S.G. § 2K2.1(c)(1). That cross-reference directs us to apply U.S.S.G. § 2X1.1 if defendant's base offense level with respect to the other offense is higher than the base offense level for defendant's weapons possession. U.S.S.G. § 2K2.1(c)(1)(A). Section 2X1.1, in turn, requires the district court to calculate defendant's Guidelines range according to "[t]he base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." U.S.S.G. § 2X1.1(a).

Here, the district court cross-referenced Banks's felon-in-possession conviction with attempted murder, under U.S.S.G. § 2A2.1, which provides a base offense level of 33 "if the object of the offense would have constituted first degree murder." U.S.S.G. § 2A2.1(a)(1). The Guidelines state that "'First degree murder' means conduct that . . . would constitute first degree murder under 18 U.S.C. § 1111." *Id.* at cmt. n.1. That provision defines murder in the first degree as "the unlawful killing of a human being with malice aforethought. [This includes] [e]very murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing." 18 U.S.C. § 1111(a).

In deciding to apply the cross-reference to attempted murder, the district court stated at sentencing that

> There really wasn't any proof that indicated anything other than attempt to shoot the victim as they were taking the car . . . . The defendant did not simply use or display a deadly weapon and, of course, sometimes that happens, certainly. He fired one shot at Hall subsequent to a physical altercation. That is true, there was a confrontation in the garage/driveway area. Hall was running away from the defendant when the defendant fired the shot and, of course, then we have the testimony at the trial about how this transpired, and certainly Hall's perception of it.

R. 101 (Banks Sentencing Hr'g Tr. at 5) (Page ID #1147). The district court then described the elements of first-degree murder, before concluding that "[i]f you shoot at somebody, you just miss them, but you intend to shoot them, or at least there's every indication that you do, then that's attempted murder." *Id.* at 8 (Page ID #1150).

These factual findings were not clearly erroneous. The district court relied on information presented at trial and in Banks's Presentence Report ("PSR"). Its account was consistent with Hall's version of events, an account which the government reiterated at sentencing. *See* R. 101 (Banks Sentencing Hr'g Tr. at 30–31) (Page ID #1172–73). These facts also support a legal finding that Banks acted with malice aforethought and premeditation. Banks approached Hall, gun drawn. He fired at Hall "after Mr. Hall [had] surrendered the keys [to his car] and [had] attempted to flee." *Id.* at 31 (Page ID #1173). As the district court pointed out, Banks could have fired a shot into the ground to scare Hall, but chose instead to fire directly at him.

Banks's reliance on *United States v. Morgan*, 687 F.3d 688 (6th Cir. 2012), is not well taken. Unlike *Morgan*, the government did not in this case request an upward departure from the mandatory minimum for Banks's § 924(c) conviction. *Compare id.* at 696 (remanding case

because district court appeared to rely on same factor to apply attempted-murder cross-reference and to "increase Morgan's sentence under § 924(c)"), *with* R. 101 (Banks Sentencing Hr'g Tr. at 67) (Page ID #1209) (giving mandatory minimum sentence to Banks for § 924(c) conviction). More importantly, unlike *Morgan*, the district court here also made a finding of specific intent. *See id.* at 5–6 (Page ID #1147–48) ("It appears that the conduct referenced could be characterized as an assault with intent to commit murder, attempted murder . . . . It appears the defendant's actions do meet the definition of attempted murder, and that does appear to be correct."). Banks's objection is without merit.

## IV. STRONG'S CLAIMS

### A. Sufficiency of the Evidence to Support Strong's Conviction for Aiding and Abetting the Carjacking

Strong claims that the evidence was insufficient to convict him of aiding and abetting a carjacking. We have already stated the applicable standard of review for sufficiency-of-the-evidence challenges. With respect to aiding and abetting, we have held that the "defendant [must] in some sort associate himself with the venture, that he participate[] in it as something he wishes to bring about, and that he seek by his action to make it succeed." *United States v. Davis*, 306 F.3d 398, 409 (6th Cir. 2002) (internal quotation marks omitted).

In *Davis v. Lafler*, 658 F.3d 525, 533–34 (6th Cir. 2011) (en banc), we rejected defendant's argument that there was insufficient evidence to support a conviction for aiding and abetting a carjacking in violation of Michigan law. *Id.* at 534. In reaching this decision, we pointed to a number of factors that made the carjacking in *Davis* different from that in *Brown v. Palmer*, 441 F.3d 347 (6th Cir. 2006), where we sustained the defendant's challenge to the

sufficiency of the evidence. We noted, for instance, that "there was no evidence that Brown arrived at the scene with the perpetrator," while "Davis arrived at the scene with Washington [the principal], raising a compelling inference that they were previously acquainted." *Id.* at 533. In addition, "the behavior of Brown and Davis before and during the carjacking differed significantly. Brown engaged in no overt acts to indicate that he was involved in the crime," while Davis stood watch by a restaurant window. *Id.* "Another key difference between [*Davis*] and *Brown* is that Davis fled the scene in the stolen vehicle." *Id.* Davis was also found breaking down the car for parts when police later apprehended him. *Id.*

Although we are cognizant that *Davis* involved a state carjacking statute which came to our court on habeas review (therefore requiring us also to apply AEDPA deference to Davis's claim), we find its analysis nonetheless instructive. Indeed, each factor discussed in *Davis* appears to point in the government's favor here. At trial, Hall testified that he saw Banks and Strong walk down the street together, with both men approaching him in concert. R. 84 (Trial Tr. at 395) (Page ID #607). Hall described Strong as standing "between the driveway and the front of the house," where "[h]e could see the back of the house and he could see the front of the house." *Id.* at 400 (Page ID #612). Strong was not, in other words, a passive observer—he positioned himself so that he could have a full view of any passers-by. Strong's lookout role ended when Banks retrieved Hall's keys, at which point both Strong and Banks got into Hall's Lexus and drove off, together. Police arrested the two men soon afterwards, while they were driving the same car.

We are unconvinced by Banks's statement, given to officers after arrest and introduced by these officers at trial, that Strong "didn't have anything to do with this. He was telling me to stop and pull over." R. 85 (Trial Tr. at 636) (Page ID #848). Taken alone, this statement might have turned Strong's claim into a closer call. *See, e.g.*, *Brown*, 441 F.3d at 352 (noting that "[t]he state [had] offered no evidence that Brown had ever met the gunman prior to arriving at the gas station, that Brown possessed a weapon or handed one to the gunman, or that Brown knew that the gunman was going to commit a robbery and carjacking"). Strong, however, also made a number of phone calls from jail. During these calls, "he discussed how these events would show people on the outside that he now meant business and how he would avoid these charges or evade the charges because . . . Banks was going to take the charges for him because there was no point in both of them being in custody." R. 87 (Strong Sentencing Hr'g Tr. at 15) (Page ID #1050). Strong further described events during the police chase and "essentially suggested … that th[e] lady [they ran into] caused the accident." *Id.* at 56 (Page ID #1091). Strong did not challenge the admission of these calls into evidence at trial, and does not now challenge their admissibility on appeal. The district court concluded, based on the facts described above, that "[t]his is not a case where any reasonable person, any person whose mind is open to the evidence can find differently than the jury found." *Id.* at 25 (Page ID #1060). We agree.

## B.  Sufficiency of the Evidence to Support Strong's § 924(c) Conviction

Next, Strong contends that the evidence was insufficient to convict him of aiding and abetting the brandishing and discharge of a firearm during and in relation to a crime of violence,

in violation of 18 U.S.C. § 924(c). To prove aiding and abetting under § 924(c), the government must show both an affirmative act and intent. *Rosemond v. United States*, 134 S. Ct. 1240, 1245 (2014). The affirmative-act requirement is met easily here. "[T]he commission of a drug trafficking (or violent) crime is—no less than the use of a firearm—an essential conduct element of the § 924(c) offense." *Id.* at 1247 (internal quotation marks omitted). Carjacking is a violent crime, and we have already determined that the evidence was sufficient to find Strong liable for aiding and abetting that crime.

Many of the facts discussed above also go to intent. Strong and Banks walked towards Hall together, and Strong served as a lookout while Banks approached Hall with weapons drawn. Strong might have wanted Banks to use only the taser but, "if a defendant continues to participate in a crime after a gun was displayed or used by a confederate, the jury can permissibly infer from his failure to object or withdraw that he had such knowledge." *Id.* at 1250 n.9. Strong continued to participate by fleeing with Banks, and then, after his arrest, boasting about his actions. These facts were sufficient to satisfy the intent and affirmative-act requirements.

## C. Application of Cross-Reference Provision for Attempted Murder

Finally, Strong argues that the district court improperly cross-referenced his felon-in-possession conviction with attempted murder. On this point, because Strong is not contesting his conviction for felon-in-possession, *see* Strong Appellant Br. at 24 n.8, the district court properly looked first to U.S.S.G. § 2K2.1, which prescribes base offense levels for that offense. However, "[i]f the defendant used or possessed any firearm or ammunition in connection with the

commission or attempted commission of another offense," *see* U.S.S.G. § 2K2.1(c), we are, as we did with Banks, to look at § 2X1.1(a), which instructs us to apply "[t]he base offense level from the guideline for the [other] substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." The other "substantive offense" here is attempted murder, U.S.S.G. § 2A2.1, not because Strong attempted to murder Hall, but because Banks attempted to murder Hall. Under U.S.S.G. § 1B1.3, "the base offense level" for "cross references in Chapter Two" "shall be determined . . . in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), [by] all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. § 1B1.3(a)(1)(B). In other words, for Strong's felon-in-possession conviction, the district court held Strong to the base offense level of attempted murder, because (1) he possessed a gun, and (2) he possessed this gun "in connection with the commission" of Banks's attempted murder of Hall, which was, according to the district court, a reasonably foreseeable act in furtherance of the carjacking.

Our review of this conclusion requires us to tackle three separate but related issues. First, we must determine whether the district court properly invoked the cross-reference and relevant-conduct provisions—i.e., whether the firearm that Strong used or possessed was "in connection with the commission or attempted commission of another offense." U.S.S.G. § 2K2.1(c). We

review this decision de novo. *United States v. Tocco*, 306 F.3d 279, 284 (6th Cir. 2002). Second, we must examine whether the district court clearly erred in finding Banks's decision to shoot at Hall to be reasonably foreseeable and in furtherance of the carjacking. *Id.* Third, we must find that the district court made particularized findings on the record (1) that the decision to shoot at Hall was within the scope of the agreement between Strong and Banks and (2) that the decision to shoot was foreseeable to Strong. *See United States v. Campbell*, 279 F.3d 392, 399–400 (6th Cir. 2002).

We answer the first question in the affirmative. Although the district court determined that Banks shot at Hall, we have held before that "the use of a firearm in related conduct can trigger § 2K2.1(c)(1)'s cross reference to § 2X1.1's enhancement provision even if the weapon used in the enhancement conduct is not the same as the weapon used in the offense conduct." *United States v. Howse*, 478 F.3d 729, 732 (6th Cir. 2007). "[T]he district court may apply Guidelines § 2K2.1(c)(1) [so long as] it finds a clear connection" between the firearms in question. *United States v. Settle*, 414 F.3d 629, 634 (6th Cir. 2005). That clear connection has been demonstrated here. Strong was convicted of possessing a revolver which was found at the scene of his arrest, along with Banks's semi-automatic pistol.

Although a close call, we also think that the district court did not clearly err in finding Banks's decision to shoot at Hall to be reasonably foreseeable to Strong and in furtherance of the carjacking. Our conclusion is guided by Commentary from the Guidelines, which states that "the criminal activity that the defendant agreed to jointly undertake, and the reasonably foreseeable

conduct of others in furtherance of that criminal activity, are not necessarily identical." U.S.S.G. § 1B1.3 cmt. n.2. To illustrate this point, the Guidelines provide us with the following example:

> [T]wo defendants agree to commit a robbery and, during the course of that robbery, the first defendant assaults and injures a victim. The second defendant is accountable for the assault and injury to the victim (even if the second defendant had not agreed to the assault and had cautioned the first defendant to be careful not to hurt anyone) because the assaultive conduct was in furtherance of the jointly undertaken criminal activity (the robbery) and was reasonably foreseeable in connection with that criminal activity (given the nature of the offense).

*Id.* We find this situation analogous to the facts here. Both Strong and Banks approached Hall, with Banks carrying a loaded gun. Banks also carried a taser; presumably, Banks would use the taser first, but would use the firearm if things got out of hand. When things did in fact get out of hand, Banks shot at Hall, and left after believing that Hall had been shot. Given both the nature of this crime (the federal carjacking statute requires defendants to act "with intent to cause death or serious bodily harm") and the facts specific to this case, we think that Banks's attempted murder of Hall was reasonably foreseeable.

Finally, we believe that the district court made findings on the record that were sufficiently particularized. Under *Campbell*, "a district court must make two particularized findings: (1) that the acts were within the scope of the defendant's agreement; and (2) that they were foreseeable to the defendant." 279 F.3d at 399–400 (internal quotation marks omitted). The district court clearly made findings with respect to foreseeability. *See* R. 87 (Strong Sentencing Hr'g Tr. at 7) (Page ID #1042) ("The fact is that this [the shot at Hall] was a clearly foreseeable act."). And, although the district court could have done a better job of outlining its reasoning with respect to scope, we think its findings here were also sufficiently particularized.

22

It noted, for instance, that "[t]he defendants went to the location with a plan." *Id.* Although "we'll never know exactly what it was," part of "[t]he plan was clearly to confront Hall and to take things." *Id.* After a brief scuffle, Hall "made the decision to try to get away, and Banks discharged the firearm. *The evidence preponderates* in favor of the conclusion that the firearm was discharged in an effort to stop Hall and that it was unsuccessful, but he didn't know that." *Id.* at 8 (Page ID #1043) (emphasis added). The district court also concluded elsewhere at sentencing that the evidence was sufficient to convict Strong of carjacking, a crime that, by definition, requires an intent to cause serious bodily harm. We have previously upheld a defendant's sentencing enhancement where the defendant's partner brandished a gun and shot an off-duty security officer during a robbery, *see United States v. Brown*, 55 F. App'x 753, 754 (6th Cir. 2003), a crime similar to carjacking. *See also United States v. Williamson*, 530 F. App'x 402, 405–06 (6th Cir. 2013) (citing *Brown* and noting that defendant's conduct can demonstrate agreement to engage in robbery and that brandishing of weapon during robbery was reasonably foreseeable). Thus, under the circumstances described above, we hold that the district court complied with *Campbell*'s particularized-findings analysis.

We recognize the tension in subjecting Strong to a base offense level for a crime that the principal (Banks) has not even been convicted of committing. We recognize also that the interplay between these provisions resulted in Strong's receiving a substantially higher base offense level than he otherwise would have received. But, after careful review, we hold that the district court properly applied each Guidelines provision against Strong.

## V.  CONCLUSION

Accordingly, we **AFFIRM** both Banks's and Strong's convictions and sentences.